**THIS ORDER IS SIGNED AND ENTERED.**

**Dated: September 11, 2026**

**Hon. Rachel M. Blise**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

In re:

Aron R. Thompson and Nicole R. Thompson,

Debtors.

Case No. 22-11921-rmb

Chapter 7

---

12 Gauge Construction, LLC,

Plaintiff,

v.

Aron R. Thompson and
Nicole R. Thompson,

Defendants.

Adversary No. 23-00008-rmb

---

## POST-TRIAL DECISION

---

Aron Thompson owned a construction company called Thompson Exteriors, LLC through which he provided mostly carpentry services. After Thompson Exteriors contracted with 12 Gauge Construction, LLC to provide rough carpentry for a 141-unit apartment building in Wausau, Wisconsin, Aron's wife Nicole Thompson became more involved in the business. The project had problems from

the beginning, and 12 Gauge ultimately terminated the contract with Thompson Exteriors. 12 Gauge now contends that the Thompsons are both liable under Wisconsin's theft by contractor statute and seeks to have the resulting debt declared nondischargeable. Based on the evidence presented at trial, the Court concludes that both Thompsons are liable to 12 Gauge for theft by contractor and that the debt is nondischargeable under 11 U.S.C. § 523(a)(4).

## JURISDICTION

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and the order of reference from the district court pursuant to 28 U.S.C. § 157(a). *See* General Order No. 161 (W.D. Wis. June 12, 1984) (available at https://www.wiwd.uscourts.gov/administrative-orders) (last visited September 10, 2026). Determination of the dischargeability of a debt is a core proceeding under 28 U.S.C. § 157(b)(2)(I). To the extent the determination of dischargeability requires consideration of issues impacted by the Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011), the parties have consented to the bankruptcy court's final adjudication of these issues. *See* Dkt. No. 15, ¶ 17; Dkt. No. 16, ¶ 17; *see also* Fed. R. Bankr. P. 7008, 7012. This decision constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

### The Parties and the Bantr Project Contract

Aron Thompson formed Thompson Exteriors, LLC ("TE") in 2019. Aron is the sole member of the LLC and responsible for all operations of the LLC. Before that,

he worked for several construction companies for approximately 10 years, during which time he gained experience with many aspects of construction, with a focus on carpentry. When he formed TE, Aron started doing mostly residential construction work, and he obtained a dwelling contractor license in March 2021. To obtain that license, he took a course and an exam that included information about Wisconsin's theft by contractor laws.

On March 15, 2021, Aron was criminally charged with theft by contractor under Wis. Stat. § 943.20(3)(a). Ex. 139. A lumber yard filed a lien on the owner's property because TE did not timely pay the bill. Aron says the charge related to a dispute over supplies he ordered that were not delivered. Aron retained counsel, and the matter was resolved through a deferred prosecution agreement. Aron's wife, Nicole Thompson, was aware of Aron's legal troubles and the basis for the charges against him, in part because Nicole provided the retainer to Aron's defense counsel. *See* Ex. 31 at 5. Nicole testified that after Aron was criminally charged she was aware of Wisconsin's theft by contractor law, she was aware that project funds could be used only for project expenses, and she was aware that there could be significant consequences for failing to account for project funds. 2/11/2025 Tr. at 60:11-64:22.

12 Gauge Construction, LLC is a construction company owned by James Worthington and Dale Hudack. 12 Gauge generally functions as a general contractor, managing construction projects and hiring subcontractors to do most of

the work. The company is based in Madison but manages projects throughout Wisconsin.

In August 2021, 12 Gauge contracted with Bantr on Elm LLC to build a 141-unit apartment complex (the "Bantr Project" or the "Project"). Ex. 1. The Bantr Project was on a tight deadline, and construction needed to begin almost immediately. In planning the Project and retaining subcontractors, 12 Gauge determined that it would need to hire a contractor to do the rough carpentry (framing) work. The initial plan was to use a company Hudack and Worthington referred to as Eagle Framing, because 12 Gauge had worked with the company on other projects and had been very satisfied with their work. 12 Gauge needed the rough carpentry subcontractor to begin work in January 2022 as soon as the foundation was poured. The Eagle Framing crew was occupied on other projects during that time, so 12 Gauge needed to work with a different framing subcontractor that could start in January.

Around the same time 12 Gauge was looking for a rough carpentry subcontractor for the Bantr Project, 12 Gauge was working on another project with Aron and TE in Madison, Wisconsin that the parties referred to as the "MBS Project." The contract between 12 Gauge and TE for that project was $180,600; with change orders the payments to TE totaled $261,258. Exs. 126-127. 12 Gauge was satisfied with TE's work on the MBS Project, so Hudack and Worthington approached Aron about TE working on the Bantr Project. The Bantr Project would be by far the largest project that TE had ever worked on.

Aron met with Worthington in early January 2022 to discuss the Bantr Project. During the meeting, Aron told Worthington that he "could get 20-plus guys to go up [to Wausau]." 2/11/2025 Tr. at 204:12-17. Worthington was satisfied with his conversation with Aron, and on January 7, 2022, 12 Gauge sent a draft contract to Aron to review. Ex. 47. When Aron made the statement to Worthington, Aron knew that TE did not have 20 employees or crew members available to work on the project and that he would need to find the necessary laborers. Aron did not tell Worthington this because Aron believed he could easily find about 10 crew members to hire as employees of TE and that he could obtain 10 crew members from All Seasons Drywall, a company that provides laborers for construction projects. 2/11/2025 Tr. at 205:3-10.

On January 13, 2022, Aron had another meeting, this time with both Worthington and Hudack, to discuss the architectural plans, logistics for the Project, and the schedule. The Bantr Project had three sections—a north wing, a west wing, and a center portion. TE would begin work on the north wing while the foundation was poured for the center and the west wing. Each wing was approximately 40% of the framing work, and the center portion was approximately 20% of the framing work. TE's work would also include balconies on each unit, as well as tenant storage units.

During the January 13 meeting, Worthington and Hudack discussed with Aron the need for TE to have enough crew members to complete the framing given 12 Gauge's tight timeframe under its contract with Bantr on Elm. 12 Gauge had

budgeted only about four months to finish all the rough carpentry; it needed to be done by early June 2022. TE would need enough crew members to meet the deadline. Worthington and Hudack left the meeting with the impression that TE had 20 or more employees ready to work on the Project. 2/10/2025 Tr. at 55:12-21; *id.* at 118:2-3; *see also* Ex. 68. At the time of the meeting, TE had no regular employees. TE had relied mostly on day laborers and crew supplied by All Seasons Drywall for the MBS Project. Worthington or Hudack did not know this when they discussed the Bantr Project with Aron.

12 Gauge decided to move forward with TE. The total contract price was $1,060,975.50. Ex. 55. The contract with TE was $30,000 more than what Eagle Framing would have charged for the work. 12 Gauge covered the difference in price from its own fee for the Project. The parties' final agreement (the "Contract") is dated January 13, 2022, with a work commencement date of January 18, 2022 and a substantial completion date of June 1, 2022. Ex. 55.

During the MBS Project, Aron's wife, Nicole, had been involved in some of TE's operations, assisting with office tasks such as corresponding with 12 Gauge, preparing documents, and doing some of the accounting work. Shortly after Aron signed the contract for the Bantr Project, Nicole became much more involved in TE's business operations. On or around January 20, 2022, Nicole create what she called a "biz account" for herself, Nicole.ThompsonExteriors@gmail.com. She or Aron instructed that 12 Gauge could communicate with Nicole regarding the Bantr Project at that email address. Ex. 56. On January 25, 2022, Nicole provided 12

Gauge with the certificate of insurance for TE. Ex. 57. The signature on her email indicated that she was TE's "Business Manager." *Id.* Nicole communicated with 12 Gauge throughout TE's work on the Bantr Project, consistently using the email signature that described her as TE's Business Manager. Exs. 62, 65, 66, 67, 72, 76, 85, 93, 97, 98, 100, 104.

**Payments to Thompson Exteriors**

The flow of payments for the Bantr Project followed what Worthington and Hudack described as a process that is typical in the commercial construction industry. A portion of the process is also described in the Contract. Ex. 55 at 4, § 11.B. Each month, 12 Gauge's subcontractors would submit a document to 12 Gauge called an Application and Certification for Payment, which the parties colloquially referred to as a "pay application." The pay applications were intended to cover the progress payments to which a subcontractor would be entitled based on work completed to date. *Id.* The subcontractor payment applications were due on the 20th of each month. 12 Gauge compiled the pay applications from all the subcontractors and suppliers and submitted them to Bantr on Elm in a Contractor's Application for Payment (which the parties also referred to as a "pay application"). When 12 Gauge received the funds from Bantr on Elm or its lender, 12 Gauge would pay its subcontractors as appropriate, generally on or after the 21st of the month following the month in which the pay application was submitted. Under this process, a pay application submitted to 12 Gauge by a subcontractor on January 20 would be paid on or after February 21.

Subcontractors were expected to submit pay applications only for work they already completed. However, because work was expected to progress rapidly, subcontractors were permitted to include in their pay applications requests for payment for work anticipated to be completed by the next payment date. So a pay application submitted on January 20 (which would be paid on February 21) could include payment for work not yet completed on January 20 but expected to be completed by February 21, when 12 Gauge received payment from Bantr on Elm. If a subcontractor requested payment but the work was not completed when 12 Gauge received the funds, 12 Gauge could and did withhold the requested funds until the work was completed. The Contract expressly provides that 12 Gauge could withhold payment to account for work not completed. Ex. 55 at 5, § 11.G.

During the parties' January 13, 2022 meeting, Aron asked for a $260,000 deposit to start the work, which the parties called a "mobilization fee." This "mobilization fee" would allow TE to be paid for work it had not yet completed, which was contrary to 12 Gauge's ordinary practice. However, after discussion with Aron, Worthington and Hudack concluded that the early "mobilization fee" was reasonable based on the logistics of the job. TE would need to bring a crew from Madison to Wausau, approximately 2 hours away by car, and the crew would need to stay in a hotel during the week. Also, TE was a small contractor without the means to purchase necessary supplies and fund weekly payroll before receiving payment from 12 Gauge.

TE submitted its first pay application in the amount of $260,000 on January 19, 2022. Exs. 52, 53, 54. This amount was the "mobilization fee" that Aron had discussed with 12 Gauge. A signed version of TE's first pay application is not in the record, but the testimony confirms that TE requested payment of $260,000 and adopted the statements in the unsigned pay application. That first pay application, and all others submitted by TE, includes the following statement: "The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due." Exs. 54, 62, 76, 93.

On February 1, 2022, 12 Gauge submitted a pay application to Bantr on Elm that included, on line 38, a payment for "Rough Carpentry (Eagle)" in the amount of $260,000. Ex. 7 at 4. Attached to the application was an unsigned subcontractor pay application from TE for $260,000. *Id.* at 91.

It is unclear what work Aron or any of his crew performed for the Bantr Project between January 20, 2022, when the Contract was fully signed, and mid-February 2022. On Friday, February 4, 2022, Aron emailed Worthington, Hudack, and a representative of the architect to ask questions regarding framing dimensions. Ex. 58. By February 15, 2026, Aron told the Project superintendent that he could not move forward because he believed the dimensions were

inaccurate. Ex. 59. The discrepancy was sorted a few days later, and by Thursday, February 17, Hudack instructed Aron to have TE fully staffed on the Bantr Project site by the following week. Ex. 60.

The next day, Friday, February 18, Aron requested full payment of TE's first pay application in the amount of $260,000. Ex. 61. Hudack responded on Monday, February 21, stating that 12 Gauge had not received payment from Bantr on Elm, that 12 Gauge expected payment that day but it was a bank holiday, and that 12 Gauge could provide a payment of $50,000 that morning. *Id.* Aron responded that "the payment is due in full." *Id.* 12 Gauge eventually agreed to pay TE $110,000 so that TE could start or resume work. *See* Ex. 129 at 1. 12 Gauge paid TE another $75,000 on February 28, 2022, and another $75,000 on March 8, 2022. *Id.* at 2-3. These three payments totaled $260,000, the amount of TE's first pay application.

On February 24, 2022, Nicole submitted a pay application to 12 Gauge on behalf of TE in the amount of $215,000. Ex. 62. The pay application was signed by Aron and included the same statement as the first, unsigned pay application. *Id.* The next day, Mandy Corell, an executive assistant with 12 Gauge, informed Nicole that TE could draw only $110,000. Ex. 65. Corell updated the pay application, which already included Aron's signature. *Id.* Nicole responded, "I don't think there was anything in the contract saying that there was a limit as to how much we can request." Ex. 66. Corell explained that the draws must relate to the work that was completed. *Id.* This explanation makes sense based on the testimony related to the pay application process. By February 24, 2022, TE had barely started the framing

work, but TE had submitted pay applications requesting nearly 45% of the Contract price—$475,000 ($260,000 and $215,000) of $1,060,975.50. Nicole ultimately agreed to reduce TE's February pay application to $110,000. *Id.* The total adjusted number was still nearly 35% of the price—$370,000 of $1,060,975.50. Had 12 Gauge followed its normal payment practices, it would have expected TE to have finished 35% of the framing work by or shortly after March 21, the date when 12 Gauge was set to receive the funds from the February pay application.

On March 1, 2022, 12 Gauge submitted a pay application to Bantr on Elm that included, on line 38, a payment for "Rough Carpentry (Thompson)" in the amount of $110,000. Ex. 8 at 4. Attached to the application was an unsigned subcontractor pay application from TE for $110,000. Ex. 8 at 57.

On Friday, February 25, 2022, Worthington sent an email expressing disappointment that Aron was not on the job site. Ex. 67. Nicole responded with a lengthy email complaining about TE not yet having received the second portion of the $260,000 "mobilization fee" (recall that on February 21 TE received $110,000 of the $260,000 requested in the first pay application) and about 12 Gauge having limited the amount of TE's second draw request. *Id.* She said, "If we cannot draw the amount we need, then we cannot pay labor and we cannot have that many guys working. It is a catch 22 when it comes to these draws with labor, hotels and perdiem [sic] all being paid." *Id.* Despite Nicole's claim that TE was paying hotel expenses, TE in fact had paid only $704.88 in lodging expenses at that point based on the expense spreadsheets the Thompsons prepared. *See* Ex. 514. TE and other

contractors on the Bantr Project were allowed to rent rooms on credit from a hotel owned by the same company that owned the Bantr Project.

On March 22, 2022, Aron and Nicole had a video meeting with Worthington and Hudack regarding the Project. During the meeting, Nicole became upset and yelled at Worthington and Hudack for not providing the payments that TE requested. The meeting related, in part, to a large unpaid hotel bill. Aron and Nicole requested payment from 12 Gauge and assured Worthington and Hudack that the funds would be used to pay the hotel. The next day, Hudack agreed to release $70,000 from the second draw that TE requested (the one submitted in February for $110,000 that was to be paid in March). *See* Ex. 129 at 4. He told Aron and Nicole, "With that we expect to have written confirmation that the Hotel is 100% taken care of and up to date by this Friday 3/25." Ex. 74. The payment to the hotel did not clear until April 8, 2022. *See* Ex. 514; Ex. 30 at 67.

On March 29, 2022, the superintendent for the Bantr Project sent an email to Hudack with a picture showing the framing progress and a note that Aron was not at the Project site. Ex. 75. The picture showed the completed framing for the north wing of the Project, where TE had started. The plans called for three floors of framing, but only one floor was near completion. TE had not started on the center section or the west wing, both of which would have four floors of framing. By that point, TE had completed approximately one-third of 40% of the framing, yet TE had been paid about 30% of the Contract price.

On March 30, 2022, Nicole sent 12 Gauge a pay application for $130,000 on behalf of TE. Ex. 76. The pay application was signed by Aron and included the same language as the first pay application. The same day, 12 Gauge submitted a pay application to Bantr on Elm that included, on line 38, a payment for "Rough Carpentry (Thompson)" in the amount of $130,000. Ex. 9 at 4. Attached to the application was an unsigned subcontractor pay application from TE for $130,000. *Id.* at 60.

Shortly thereafter, Aron agreed that another framing company would be needed to assist with the Bantr Project so 12 Gauge could meet its deadlines. Aron told 12 Gauge that TE could finish both the north wing and the center section, approximately 60% of the original Contract scope of work, with the other contractor completing the west wing. On April 11, 2022, TE and 12 Gauge signed a change order reducing TE's scope of work and decreasing the Contract price by $400,000. Ex. 78. The new Contract price was $660,975.50. 12 Gauge entered into a contract with Precision Carpentry for $400,000 to cover the scope of work that was removed from TE's Contract.

12 Gauge released another $40,000 to TE on April 12, 2022. Ex. 129 at 5. At the same time, 12 Gauge pressed TE regarding the timeline to complete the remaining work in the Contract and the budget to complete it. On April 19, 2022, Aron prepared a schedule and budget for the remaining work. Ex. 82. Hudack reviewed the information and concluded that it did not make sense and did not account for certain items still included in TE's scope of work. Ex. 84.

On April 21, 2022, Nicole sent an angry email to Hudack and Worthington demanding payment of the pay application TE submitted in March for $130,000 (based on the schedule described above, TE would have expected the pay application submitted in March to be paid on April 21). Ex. 85. She said, "I need to have this payment tomorrow (Friday) otherwise I am unable to pay labor and continue moving this job forward." *Id.* She also said, "We were under the impression that if we got you the budget and timeline by the 20th you would be able to release payment. We did that and are now expecting that payment to cover these auto pulls from our account." *Id.* When Worthington responded that 12 Gauge needed TE to get back on schedule, Nicole said in response, "I have not had to run the financials on this business like this before or with this large of funds and I am getting to end of our bank fronting us until we can make it up." *Id.* 12 Gauge agreed to pay TE $30,000 on April 21, 2022 and another $45,000 on April 29, 2022. Ex. 129 at 6-7.

On April 25, 2022, Nicole submitted a pay application to 12 Gauge in the amount of $130,000. Ex. 93. It was signed by Aron and included the same language as the first pay application. *Id.* On April 30, 2022, 12 Gauge submitted a pay application to Bantr on Elm that included, on line 38, a payment for "Rough Carpentry (Thompson)" in the amount of $130,000. Ex. 10 at 4. Attached to the application was an unsigned subcontractor pay application from TE. *Id.* at 95.

Nicole grew impatient that TE was not receiving the remainder of the $130,000 it requested in the March pay application. (By then TE had received

$75,000 of the $130,000 requested.) 12 Gauge began to suspect that TE had not used the Bantr Project funds for Project-related expenses. Based on the percentage of work completed and the anticipated expenses for that work, 12 Gauge believed TE should not be short on funds. 12 Gauge requested that TE submit a list of all expenses for the Project. On May 11, 2022, Nicole prepared a spreadsheet of expenses that Aron forwarded to Hudack on May 13, 2022. Ex. 97. Nicole said she generated the spreadsheet using QuickBooks and did not have time to verify its accuracy. Upon reviewing the information, Hudack immediately noticed that the spreadsheet included many costs that were not related to the Bantr Project, including several payments to Knight Capital Funding and payments to the IRS. According to Hudack's analysis, TE had received $445,000 but had spent only $347,120.93 on Project-related expenses. Ex. 98. Hudack estimated that TE should have approximately $97,880 in Bantr Project funds remaining. *Id.*

12 Gauge eventually agreed to release another $30,000 to TE on May 20, 2022 to keep the project moving. Ex. 129 at 8. 12 Gauge also issued a check in the amount of $80,000 payable to both TE and All Seasons Drywall because TE had not been paying All Seasons Drywall, which had supplied several crew members. *Id.* at 9. 12 Gauge issued another check on June 6, 2022 in the amount of $50,000 to both TE and All Seasons Drywall to cover additional bills TE had not paid. *Id.* at 10.

On Thursday, May 26, 2022, Hudack emailed Aron and Nicole noting that no foreman or supervisor was on site with the TE crew. Ex. 104. Hudack said that the lack of supervision had caused significant problems with the completion of the work.

In the ensuing email conversation between Nicole and Hudack, Hudack requested information about the costs TE had not yet paid and what TE expected to pay for the duration of the Project. *Id.* Rather than provide any information, Nicole questioned the need for 12 Gauge to receive such information: "I am unsure why our funding, contracts that go back on our business, and money we owe people pertains to you?" *Id.*

Hudack credibly testified that it is not typical for a subcontractor not to provide the information 12 Gauge had requested. 2/10/2025 Tr. at 185:17-186:4. 12 Gauge is ultimately responsible for paying any sub-sub-contractor or supplier that could place a lien on the property. Ensuring that all such bills are paid timely is an important part of a general contractor's work.

In mid-June 2022, 12 Gauge terminated the Contract due to TE's breach and failure to perform. By that time, TE had received a total of $605,000 of the Contract price of $660,975.50. Of that amount, $475,000 was paid directly to TE and $130,000 was paid to All Season Drywall. TE had not completed either the north wing and the center section by the time 12 Gauge terminated the Contract.

With each of the payments that TE received, Aron or Nicole signed a "Partial Waiver of Lien." Ex. 128. The lien waivers were substantially identical, except that the date was changed to reflect the date of each payment. The first of such waivers is reproduced below:

**PARTIAL WAIVER OF LIEN**

For value received, Subcontractor hereby waives all lien and bond rights and claims for lien on land and on buildings about to be erected, being erected, erected, altered or repaired and to the appurtenances thereunto, for the following project:

**Project Name:** **202111 - Bantr Wausau**
**Project Address:** **1520 Elm Street**
**Wausau, WI 54401**

**Work Requested By:** **12 Gauge Construction, LLC**

This waiver of lien and bond rights is for all labor performed, materials and equipment furnished and services for the erection, construction, alteration or repair of said land and on buildings provided 2/1/2022

**Subcontractor:** **Thompson Exteriors LLC**

**Print name** Nicole Thompson
**Sign name** [signature]
**Title:** Business Manager
**Date:** 2/21/2022

According to the testimony from 12 Gauge's representatives, all of 12 Gauge's subcontractors signed similar or identical lien waivers with each payment they received. The lien waivers were intended to be a representation that the subcontractor had completed, and paid subcontractors for, all work through the date of the waiver.

**12 Gauge's Damages Evidence**

After terminating the Contract with TE, 12 Gauge contracted with Precision Carpentry to cover the center section work that was included in the TE Contract. Ex. 150. TE had received payment for all but approximately $55,000 of the Contract price. Precision Carpentry charged $205,000 for the center section work. *Id.* 12 Gauge had to cover the $150,000 difference in price from its own fee for the Project.

Hudack credibly testified that the framing for the Bantr Project was completely out of sequence by the time TE left. 2/10/2025 Tr. at 212:22-25. TE had not finished the punch list for the north wing, and many decks still needed to be built. In addition to hiring Precision Carpentry for the center section, 12 Gauge hired Eagle Construction Services, LLC to perform other work that was included in TE's Contract. (This appears to be the same as the "Eagle Framing" company that 12 Gauge originally wanted to hire for the Bantr Project). Eagle provided services on a time and materials basis, which was far more expensive than if 12 Gauge had been able to negotiate a contract price with Eagle. Hudack credibly testified that all the services Eagle performed were within TE's scope of work. 12 Gauge paid Eagle a total of $343,147.50.

TE was also supposed to frame storage units for the apartments, which work was unfinished. 12 Gauge hired a contractor named Sticks & Bricks LLC to perform that work and paid $14,560.00. Ex. 123.

TE left at least two of its subcontractors unpaid, and 12 Gauge had to pay to prevent those subcontractors from exercising their lien rights. 12 Gauge paid $19,249.02 to Ideal Crane Rental, Inc. Ex. 149. Ideal Crane rented equipment that TE used while working on the Bantr Project. TE made several payments to Ideal Crane, but some of the charges were not paid. Ideal Crane refused to work with 12 Gauge on a different project until the bill was paid in full.

12 Gauge also paid Tradesmen International $30,255.13. Ex. 148. TE had obtained some of its crew for the Project through Tradesmen International and had

not paid some invoices for those crew members. 12 Gauge paid the bill after Tradesmen International sent a notice indicating that it would file a lien on the property. *Id.*

In sum, 12 Gauge spent $597,211.65 paying for work that was within the scope of TE's Contract. The Thompsons did not contest that 12 Gauge was damaged in this amount, or that 12 Gauge would not have had to spend the money if TE had performed under the Contract.

**Where Did the Money Go?**

Between mid-February and June 2022, TE worked only on the Bantr Project. TE did receive some payments for prior projects during that time, but the bulk of the funds that TE received were for the Bantr Project. All TE expenses were charged either to a business checking account at Bank of New Glarus or to an American Express account in the name of TE. Aron and Nicole were both signatories on the checking account, and each had their own card for the American Express account. This simple structure of TE's finances makes it very easy to see how TE spent the money it received from 12 Gauge.

TE's money troubles began before it started work on the Bantr Project. In December 2020, TE obtained short-term funding from Knight Capital Funding in the form of a Future Receivables Sales Agreement. Ex. 40. The agreement required TE to pay Knight Capital every business day until the contracted sum was paid in full, and Knight Capital was authorized to withdraw the daily payments directly from TE's business checking account at Bank of New Glarus. TE entered into at least two additional agreements with Knight Capital, one in July 2021 and one in

October 2021. Those agreements required daily payments of $148.92 and $130.31 respectively. Knight Capital was drawing daily payments on those two agreements when TE started work on the Bantr Project, and the daily payments continued through at least May 2022.

On February 18, 2022, before receiving any payment from 12 Gauge, the balance in TE's checking account was negative $11,818.47. On February 22, 2022, TE deposited $113,458 in its checking account. This sum included the first payment of $110,000 TE received from 12 Gauge for the Bantr Project and $3,458 from another source.[1] Ex. 30 at 55. That deposit covered the existing overdraft. After accounting for the payment from another source, $8,360.47 of the Bantr Project funds were used to cover the overdraft. The Thompsons claim the account was overdrafted soley because TE had to spend significant sums on the Bantr Project before receiving the first payment. This is not supported by the evidence.

The Thompsons submitted lists of the expenses for the Bantr Project, which are discussed in more detail below. The lists include the following Project expenses charged to the TE checking account[2], which total $7,523.11:

| | | |
|---|---|---|
| 2/1/2022 | BP (Fuel) | $12.92 |
| 2/3/2022 | Indeed.com (Advertising) | $390.21 |
| 2/3/2022 | Amazon (Supplies) | $56.24 |
| 2/3/2022 | Amazon (Supplies) | $252.15 |
| 2/7/2022 | Amazon (Supplies) | $293.30 |
| 2/7/2022 | Indeed (Advertising) | $500.09 |

[1] The deposit ticket for this deposit includes copies of two checks from 12 Gauge, one for $110,000 and one for $3,458. Ex. 31 at 62. The $3,458 check likely related to the MBS Project.

[2] The Thompsons' list of claimed expenses for Meals includes a $30.00 charge to the checking account on 2/7/2022. Ex. 513. As explained below, that was not a legitimate business expense.

| | | |
|---|---|---|
| 2/9/2022 | Heartland Graphics (Advertising) | $2,727.20 |
| 2/16/2022 | Advanced Fastening Supply (Supplies) | $3,291.00 |
| | Total | $7,523.11 |

Ex. 30 at 55-56; Ex. 31 at 27-28. Thus, according to TE's own expense spreadsheets, the overdraft from its bank account was not wholly from Bantr Project expenses, and the overdraft included at least $4,295.36 in charges unrelated to the Project. If the $3,458 TE received from another source is credited against the overdraft for unrelated expenses, then TE used Bantr Project funds to cover at least $837.36 in non-Bantr Project charges immediately upon depositing the first payment from 12 Gauge.

After covering the overdraft, all the remaining funds in the TE checking account after the February 22 deposit were Bantr Project funds that should have been spent on Project expenses. Yet the Thompsons immediately spent significant sums on non-Project expenses. The Thompsons made a payment of $1,500 to the IRS on February 22 right after depositing the funds. Ex. 30 at 55. They also immediately made three payments totaling $17,603.38 to the TE American Express credit card on February 22, 2022. *Id.* The American Express statement for February closed on February 11, 2022 with a balance of $12,134.09. Ex. 39 at 53. The Thompsons paid that balance and then some on February 22. The statement balance included $4,259.41 for the following charges that were included on the Thompsons' lists of Bantr Project expenses[3]:

| | | |
|---|---|---|
| 2/1/2022 | Pick n Save (Groceries) | $94.96 |
| 2/1/2022 | The Bar – Wausau (Meals) | $22.71 |

[3] The Thompsons' list of Meals includes a charge of $12.12 to the American Express on 2/4/2022 at a Dairy Queen in Fitchburg, Wisconsin. Ex. 513. As explained below, this is not a Project expense.

| | | |
|---|---|---|
| 2/1/2022 | La Taqueria (Meals) | $21.19 |
| 2/2/2022 | Conney Safety Products (Supplies) | $480.17 |
| 2/2/2022 | Panera Bread (Meals) | $17.28 |
| 2/3/2022 | Applebees (Meals) | $121.31 |
| 2/3/2022 | Kwik Trip (Fuel) | $15.81 |
| 2/3/2022 | Kwik Trip (Fuel) | $74.60 |
| 2/3/2022 | Grand Lodge & Hotel (Lodging) | $234.96 |
| 2/3/2022 | Grand Lodge & Hotel (Lodging) | $234.96 |
| 2/3/2022 | Grand Lodge & Hotel (Lodging) | $234.96 |
| 2/7/2022 | Menards (Supplies) | $836.73 |
| 2/7/2022 | Panera Bread (Meals) | $10.54 |
| 2/7/2022 | Wisconsin Lifting Specialists (Supplies) | $359.80 |
| 2/8/2022 | Home Depot (Supplies) | $840.12 |
| 2/8/2022 | Menards (Supplies) | $275.52 |
| 2/9/2022 | Panera Bread (Meals) | $12.64 |
| 2/10/2022 | The Bar – Wausau (Meals) | $291.18 |
| 2/10/2022 | Panera Bread (Meals) | $17.28 |
| 2/11/2022 | Texas Roadhouse (Meals) | $62.69 |
| | Total | $4,259.41 |

Ex. 39 at 56-57. Thus, the balance on the American Express card for the February statement included $7,874.68 in charges that the Thompsons do not claim are related to the Bantr Project. These unrelated charges on the February statement included, among many others, $5,000 to Brunsell Lumber, a vendor unrelated to the Project, $1,472.78 to RealTruck, $208.40 for a wine club, and $200.20 at a hair salon. *Id.* Those non-Project charges were all paid using Bantr Project funds when the Thompsons paid the American Express bill in full on February 22.

The Thompsons also immediately requested five electronic transfers or checks totaling $6,035.84 from the TE checking account on February 22, 2022. Ex. 30 at 56. There is no information in the record regarding the recipients of these payments, but the payments do not appear on the Thompsons' lists of claimed

Project expenses. *Compare id. with* Exs. 508A, 509, 510A, 511, 512A, 513A, 514, 515.

In addition to all those non-Project expenses paid with the Bantr Project funds TE deposited on February 22, Knight Capital continued to debit $130.31 and $148.92 each business day. After February 22, those debits totaled $1,116.92 for the remaining four business days of the month. Ex. 30 at 55.

Between covering the overdraft for unrelated expenses ($837.36), the IRS payment ($1,500), the portion of the American Express payment for unrelated expenses ($7,874.68), the mysterious electronic transfers ($6,035.84), and the continuing Knight Capital charges ($1,116.92), the Thompsons used at least $17,364.80 from Bantr Project funds to cover expenses unrelated to the Bantr Project in just the first few days after receiving the first payment from 12 Gauge.

Those were only the expenses that appeared on the TE bank statement for February. In the first days of March, checks started to clear that the Thompsons wrote in February for non-Project expenses. On February 22, 2022, Nicole immediately wrote four checks for expenses unrelated to the Bantr Project. She paid $6,015.79 to Randy Burrow, a laborer who was working on the MBS project at the time; she paid $1,847.17 to the City of Monroe, Wisconsin for property taxes on a piece of real estate owned by TE; she paid $1,608.00 to the Wisconsin Department of Revenue for "2021 State Taxes"; and she paid $50,706.00 to All Seasons Drywall, with $29,250.00 of that amount being for the MBS Project. Ex. 31 at 29-31. In all, Nicole wrote checks totaling $38,720.96 for expenses unrelated to the Bantr Project

the same day that TE deposited the first payment from 12 Gauge and using the funds received from 12 Gauge for the Bantr Project.

The payment of non-Project expenses continued throughout March. Nicole paid $29,460.88 to Tamarack Materials and a total of $10,614.36 to Brunsell Lumber, neither of which provided any materials for the Bantr Project. Ex. 31 at 30, 31. The Thompsons made payments to their personal Capital One and Discover credit cards totaling $8,439.27. Ex. 30 at 59. They made a payment of $1,500 to the IRS, and a payment of $126.00 to the Wisconsin Department of Transportation. *Id.* They also used the debit card for the TE checking account to make purchases at restaurants, Amazon, and other stores, and they made a Venmo transfer to an unknown recipient for $500. Ex. 30 at 61-62. In addition, the Knight Capital daily debits continued, totaling $6,422.29 in March. *Id.* at 59-60.

TE received just one payment from a source other than 12 Gauge in March. There was a deposit of $97,000 into the TE checking account on March 10, 2022. Ex. 30 at 59. TE received $75,000 from 12 Gauge for the Bantr Project that day, so $22,000 of the deposit must have come from another source.[4] The withdrawals from the TE account for expenses unrelated to the Bantr Project expenses totaled far more than $22,000 in March, meaning that the Bantr Project funds clearly were used for the expenses unrelated to the Bantr Project.

The pattern continued in April and May 2022, with the Thompsons continuing to spend significant sums on non-Project expenses. In April, the daily

---

[4] The deposit ticket for this deposit includes copies of two checks from 12 Gauge, one for $75,000 and one for $22,000. Ex. 31 at 64. The $22,000 check likely related to the MBS Project.

debits for Knight Capital totaled $5,175.06, though a few of the debits were returned for insufficient funds. Ex. 30 at 64-65. The Thompsons paid the IRS $1,500 on April 22, they made two payments of $2,309.63 for their home mortgage loan on April 4 and April 25, they made a purchase of $1,793.49 at an antique store in Wisconsin Rapids on April 4, and they requested an electronic transfer or check in the amount of $3,450 on April 4 to an unknown recipient. Ex. 30 at 65-66. They also incurred $1,080 in overdraft and returned item fees. *Id.* at 67.

By April 8, 2022, the balance in the TE checking account was negative $36,899.71, and it continued to drop each day. *Id.* After TE deposited a $40,000 payment from 12 Gauge on April 12, 2022, the balance was still negative $5,487.40. *Id.* On April 21, 2022, the balance in the account was negative $24,127.78. *Id.* This explains Nicole's frantic email to Hudack and Worthington that day demanding payment of the entire $130,000 requested in the pay application TE submitted in March. *See* Ex. 85. The $30,000 that 12 Gauge released to TE on April 21 provided a temporary reprieve, but the balance in the account was again negative on April 25, 2022, and it continued to be negative through the end of April. Ex. 30 at 67.

TE deposited $54,000 in the checking account on May 2, 2022. *Id.* at 68. TE received a payment of $45,000 from 12 Gauge for the Bantr Project, so $9,000 must have come from another source.[5] The Thompsons spent almost the entire amount

[5] The deposit ticket for this deposit includes copies of two checks from 12 Gauge, one for $45,000 and one for $9,000. Ex. 31 at 68. The $9,000 check likely related to the MBS Project.

immediately. They transferred $5,000 to their personal checking account on May 2, 2022. *Id.* at 70; Ex. 31 at 37; Ex. 27 at 33. They transferred another $15,000 to their personal account a few days later on May 6, 2022. Ex. 30 at 69; Ex. 27 at 33. They also made a payment of $1,500 to the IRS; they made a payment of $2,309.43 on their personal mortgage; they made a loan payment of $963.45; a check for $14,171.67 cleared that Nicole wrote in April to Badgerland Supply (a supplier unrelated to the Bantr Project); a check for $808.60 cleared that Nicole wrote to IMT Insurance; they paid $360.00 in overdraft and returned item fees; and they paid $4,728.30 to Knight Capital. Ex. 30 at 68-71; Ex. 31 at 37-38. TE received another payment of $30,000 from 12 Gauge on May 20, which was also gone in a matter of days. Ex. 31 at 69. The balance was negative $36,976.89 on May 31, 2022. Ex. 30 at 70. A large portion of the overdraft resulted from the bank covering a check to Rolando Mendoza Bautista Laborers for $25,000. Ex. 30 at 70; Ex. 31 at 39. The parties stipulated that the payment was for a Project-related expense, but the payment could not have come from Bantr Project funds because the funds were exhausted by that point.

As with the TE checking account, the Thompsons used the TE American Express account for many personal and non-Project expenses. The statement periods ending on March 14, 2022 and April 13, 2022 were paid in full using funds from the TE checking account, which largely included funds from 12 Gauge for the Bantr Project. *See* Ex. 39 at 60-80; Ex. 30 at 60, 65. The March statement included thousands in purchases at Menards in February 2022 that Aron agreed were for the

MBS Project. Ex. 39 at 63; 2/13/2025 Tr. at 98-99. The two statements include the following charges, totaling $10,258.80 that the Thompsons do not claim as expenses for the Bantr Project:

| | | |
|---|---|---|
| 2/15/2022 | Brunsell Lumber | $2,614.37 |
| 2/19/2022 | Pomp's Tire & Auto | $1,621.78 |
| 2/21/2022 | Pomp's Tire & Auto | $194.39 |
| 3/1/2022 | Fiesta Winery | $84.68 |
| 3/2/2022 | Brunsell Lumber | $1,000.00 |
| 4/8/2022 | Monroe Powersports | $215.30 |
| 4/8/2022 | Monroe Beverage Mark | $223.01 |
| 4/12/2022 | Tamarack Materials | $592.51 |
| 4/12/2022 | Tamarack Materials | $3,712.76 |
| | Total | $10,258.80 |

Ex. 39 at 60-75. This total does not include several charges at restaurants near the Thompsons' home, as well as other charges that, as explained below, the Court finds were not related to the Bantr Project.

The Thompsons continued using the American Express card after the April statement closed on April 13, 2022. The statement that closed on May 13, 2022 included both personal and Bantr Project-related expenses. Ex. 39 at 81-87. The balance at the end of that period was $13,134.11. *Id.* at 81. An automatic payment for most of the balance was attempted from the TE checking account on May 28, 2022. By that time, however, the TE checking account was negative and the payment was returned. *Id.* at 94. Neither TE nor the Thompsons ever paid that balance. *See* Ex. 39 at 92-127. American Express filed a proof of claim in the Thompsons' bankruptcy for $16,352.93. Case No. 22-11921, Claim No. 15-1. Therefore, any Bantr Project-related expenses that were charged to the TE

American Express card after April 13, 2022 could not have been paid using Bantr Project funds because the charges were not paid at all.

**TE Claimed Expenses**

The Thompsons kept few or no receipts for the expenses that they now claim are Bantr Project expenses. Instead, they imported the TE checking and credit card account statements into QuickBooks. Neither contemporaneously tagged the transactions for a particular project or as a personal or business overhead expense.

When 12 Gauge asked for a list of Bantr Project expenses in April 2022, the Thompsons simply exported the expenses from QuickBooks without removing expenses that clearly were not related to the Project. *See* Ex. 97. In discovery, the Thompsons provided a single spreadsheet of claimed Project-related expenses to 12 Gauge. That spreadsheet was admitted in evidence as Exhibit 144.

The Thompsons reformatted the single spreadsheet into eight separate spreadsheets for each category of claimed expenses and submitted them as separate proposed exhibits before trial. *See* Dkt. No. 67, Exs. 508-515. In the middle of trial, the Thompsons submitted amended versions of some of those exhibits, labeled Exhibits 508A, 510A, 512A, and 513A. Dkt. No. 69.[6]

[6] Exhibits 508A, 509, 510A, 511, 512A, 514, and 515 were admitted in evidence. See Dkt. No. 70. For reasons unknown, neither party sought admission of Exhibit 513A. Aron confirmed that Exhibit 513A is identical to the information in Exhibit 144, except that certain of the expenses were removed. 2/13/2025 Tr. at 162:4-11. Because Exhibit 144 is in evidence, and Exhibit 513A does not include information that was not in Exhibit 144 (other than the removed transactions column supported by Aron's testimony), the Court will exercise its discretion to supplement the record with Exhibit 513A. *See, e.g.*, *Bistrian v. Levi*, 448 F. Supp. 3d 454, 483 (E.D. Pa. 2020) (citations omitted) ("District courts have broad discretion to reopen the record to take new evidence, which may occur on motion of a party or *sua sponte*.").

12 Gauge agrees that the Bantr Project funds were spent, at least in part, on Project-related expenses. 12 Gauge did not present its own competing list of expenses that 12 Gauge says were paid from Bantr Project funds. The Court therefore starts from the Thompsons' spreadsheets of claimed expenses. Having reviewed the spreadsheets, and the testimony at trial, the Court finds that many of the expenses included on the spreadsheets were not related to the Bantr Project. Other expenses were related to the Project, but the record indicates that the expenses were not paid using Bantr Project funds. The Court makes the following findings of fact regarding the expenses on the Thompsons' spreadsheets.

*Contractor Labor*

The Thompsons claim that TE spent a total of $206,268.73 on Project-related labor. Ex. 508A. 12 Gauge agrees that TE spent $167,695.48 on labor expenses related to the Bantr Project. 2/13/2025 Tr. at 79:1-81:21. The parties do not appear to have stipulated, however, that TE paid for those expenses with Bantr Project funds. *See id.* The Court will address each line on Exhibit 508A that is disputed or that the Court finds was not paid with Project funds. The Court finds that the lines not discussed below were Bantr Project expenses paid with Project funds.

<u>Line 5</u> – On February 22, 2022, Nicole wrote a check to All Seasons Drywall for $50,706.00. Ex. 31 at 29. The memo line of the check refers to numbers for invoices that were not admitted in evidence. *Id.* 12 Gauge argues that none of the payment is related to the Bantr Project. Aron testified that $21,236.00 of the amount was for the Bantr Project, while the remainder was for the MBS Project. Aron also testified that Humberto Lopez was the head of the crew from All Seasons

Drywall. 2/13/2025 Tr. at 141:17-142:3. A composite exhibit that included various days of sign-in sheets for the Bantr Project site was admitted as Exhibit 502. Humberto Lopez signed in on January 28 and February 1, 2022, indicating that he (and likely other workers from All Seasons Drywall) were working on the Project before February 22, 2022. Ex. 502 at 2-3. Therefore, the Court finds that crew from All Seasons Drywall had performed work on the Bantr Project as of February 22, 2022. In the absence of other evidence, the Court finds that the amount on Exhibit 508A accurately reflects the amount paid for Bantr Project work from the February 22 payment—i.e., $21,536.00.

Line 25 – TE gave a check to worker Randy Burrow on March 24, 2022 in the amount of $4,316.50. Ex. 31 at 33. The memo line refers to MBS. *Id.* The Thompsons agree that $520 of the check was for work at the MBS Project, and they contend $3,796.50 was for work on the Bantr Project. TE paid Burrow over $6,000 on February 22 for work on the MBS Project, which was finished or almost finished by that point. *Id.* at 30. The evidence suggests that Burrow likely was working on the Bantr Project by March 24, 2022. The Court therefore finds that the amount on Exhibit 508A accurately reflects the amount Burrow was paid for Bantr Project work, and that the payment was made using Project funds.

Line 46 – On April 24, 2022, TE sent a payment of $400 to Marco Alvarado using Cash App. Ex. 30 at 66. Aron testified that this payment was to compensate Alvarado for his work on the Bantr Project. 2/13/2025 Tr. at 142:24-144:4. The

Court finds that the $400 payment was a Bantr Project expense paid with Project funds.

Lines 31, 55, 56, and 60 – These lines represent cash payments made to workers Moua Ly and Anthony Bergstrom. Aron testified that he sometimes withdrew cash from TE's checking account at an ATM to pay Ly and Bergstrom. 2/13/2025 Tr. at 136:18-137:4, 146:4-18. TE's checking account statement shows the cash withdrawals, but the Thompsons provided no other documentation to support that the cash was given to Ly and Bergstrom or that their later payments from TE were reduced by the cash Aron supposedly gave them. Ex. 30 at 66, 69-70. However, Aron's testimony provides some evidence of the payments. Without contrary evidence, the Court finds that these payments, totaling $1,148.75, were Bantr Project expenses paid using Project funds.

Lines 57, 58, 59, 66, 67, 68 – Other cash withdrawals on Exhibit 508A say only "Kwik Trip" in the "Paid to:" column. Aron testified that he believed the cash withdrawals were used to pay crew members who performed work at the Bantr Project. *See* 2/13/2025 Tr. at 146:19-25, 148:1-12. He could not identify which workers were paid, and the Thompsons produced no documentation to support their assertion that the cash was paid to the crew. At one point, Aron even stated that he did not know what he used the cash for. *See* 2/13/2025 Tr. at 148 (discussing Line 59 on Exhibit 508A). Accordingly, the Court finds that these withdrawals, totaling $1,000, were not for expenses related to the Bantr Project.

Lines 40, 42, 47, 48, 49, 50 – TE made a series of payments to Stepfon Jones using Cash App between April 14 and April 25, 2022. Stepfon Jones worked on the Bantr Project. The payments were charged to the TE American Express credit card. Ex. 39 at 84-85. As discussed above, the charges on the American Express card during the statement period that began on April 14, 2022 were never paid. Therefore, the payments, totaling $1,900, were not made using Bantr Project funds.

Line 51 – On April 26, 2022, Aron used the TE American Express credit card to purchase a prepaid Visa gift card for Anthony Bergstrom, who performed work on the Bantr Project. Ex. 39 at 85; 2/13/2025 Tr. at 144:8-19. Neither TE nor the Thompsons ever paid the charge for the gift card because the balance on the American Express card was not paid. Therefore, the $612 payment was not made using Bantr Project funds.

Line 69 – On May 31, 2022, Aron wrote a check to Rolando Mendoza Bautista Laborers for work on the Bantr Project. Ex. 31 at 39. The check was cashed the same day. Ex. 30 at 70. By that time, the Bantr Project funds that TE received had been exhausted, and the TE checking account was negative. However, the bank honored the check, further overdrafting the account. *Id.* The TE checking account was more than $25,000 overdrafted until October 14, 2022, when TE deposited approximately $94,000. *Id.* at 81. The source of the deposit is not in the record, but it is clear that the money was not Bantr Project funds, and the Thompsons do not argue that they could cure or mitigate their misappropriation by later covering Project-related expenses with other funds.

Lines 70 through 77 – TE made several payments in July, October, and November 2022 to crew members who worked on the Bantr Project. The Bantr Project funds had long since been exhausted by the time TE made those payments. Therefore, the payments were not made using Bantr Project funds. For the same reason, the "payments" Aron made to Humberto Lopez and Troy Forester by giving them items of value were not payments made using Bantr Project funds.

In sum, the Court finds that TE spent $169,576.73 on labor expenses using Bantr Project funds. The Court finds that the remaining $36,692 in expenses on Exhibit 508A either were not Bantr Project-related or were not paid using Bantr Project funds.

*Equipment Rental*

The Thompsons claim TE spent a total of $32,002.40 on equipment rental expenses for the Bantr Project. Ex. 509. 12 Gauge does not appear to contest that the charges on Exhibit 509 were for the Bantr Project.

The Court finds that five payments to Ideal Crane, Inc. between April 21 and April 28, 2022 totaling $7,677.75 were charged to the TE American Express card. Ex. 509, Lines 8-12; Ex. 39 at 85-86. As noted, the balance on this credit card was never paid. Therefore, TE could not have used Bantr Project funds to make these payments. The Court finds that TE spent only $24,324.65 on equipment rental expenses using Bantr Project funds.

*Supplies*

The Thompsons claim that TE spent $45,121.55 on supplies for the Bantr Project. Ex. 510A. 12 Gauge argues that many of these expenses are illegitimate

because the Contract was for labor only (12 Gauge supplied all the lumber), and TE should have needed minimal supplies, such as nails and other fasteners. 12 Gauge posits that many of the charges at Home Depot and Menards were for purchases of tools that then became assets of TE, and that such purchases should have been allocated to TE's overhead instead of the Bantr Project. Aron testified that he purchased items like gasket kits, saw blades, and other consumable supplies at Amazon, Home Depot, and Menards, which provides evidence that TE did spend money on Bantr Project-related supplies that were not necessarily long-term assets.

There are, however, several expenses that the Thompsons included on Exhibit 510A that the evidence shows are not Project-related or were not paid with Bantr Project funds.

<u>Lines 19 through 23</u> – The Thompsons included several charges at Menards on Exhibit 510A between February 17 and February 20, 2022. All the charges were made at a Menards in Monona, Wisconsin, near the MBS Project in Madison. Ex. 39 at 63-64. Aron testified that he was working on the MBS Project that week, and he agreed that the charges were not for supplies for the Bantr Project. 2/13/2025 Tr. at 99:14-19. The Court finds that those charges, in the total amount of $4,612.75, were not related to the Bantr Project.

<u>Line 56</u> – On March 16, 2022, TE made a payment to Amazon Store Card in the amount of $1,447.30. Ex. 30 at 59. Aron testified, "I don't know what that was." 2/13/2025 Tr. at 158:5-8; *see also id.* at 169:20-21 ("I think I just testified, didn't I, saying I didn't know."). All the other Amazon purchases that the Thompsons claim

were for supplies for the Bantr Project were made through direct charges to the TE checking account or American Express credit card. Neither Aron nor Nicole testified that any purchases were made for supplies for the Bantr Project using an Amazon credit card, and no statements for an Amazon credit card were entered in evidence. The Court finds that the payment of $1,447.30 to Amazon Store Card was not a Project-related expense.

Lines 73 and 74 – Two charges to Trading Post, LLC on April 4, 2022, totaling $1,867.32 appear on Exhibit 510A. The charges were debited from the TE checking account. Ex. 30 at 66. Aron agreed that the charges were not related to the Bantr Project, and that they should not appear on a list of Project-related expenses. 2/13/2025 Tr. at 95:18-24. The Court finds that the charges were not Project-related expenses.

Line 78 – Exhibit 510A includes a charge for Ace Hardware on April 7, 2022 in the amount of $391. The charge was made at a store in Monroe, Wisconsin, which is near the Thompsons' home. *See* Ex. 39 at 74. Aron did not testify that he purchased any supplies for the Bantr Project at Ace Hardware. Given all the other mistaken charges on Exhibit 510A and the absence of other evidence supporting the Thompsons' claim that this charge was Project-related, the Court finds that the charge was not for supplies related to the Bantr Project.

Line 79 – Exhibit 510A includes a charge for Farm & Fleet of Monroe on April 7, 2022 in the amount of $63.29. The charge was made at a store in Monroe, Wisconsin, which is near the Thompsons' home. *See* Ex. 39 at 74. When asked if he

purchased items for the Bantr Project at Farm & Fleet, Aron responded, "I don't -- I don't recall." 2/13/2025 Tr. at 158:9-11. Given all the other mistaken charges on Exhibit 510A and the absence of other evidence supporting the Thompsons' claim that this charge was Project-related, the Court finds that the charge was not for supplies related to the Bantr Project.

Lines 86 through 92 – These lines include charges at various hardware stores between April 16 and April 26, 2022. All the charges were paid using the TE American Express card. Ex. 39 at 84-86. The charges on that American Express statement were never paid. Therefore, those expenses, totaling $1,050.74, were not paid using Bantr Project funds.

Lines 95 and 96 – These lines include charges at Menards and Home Depot. TE's bank records indicate that the store locations where the charges were made are in Janesville, Wisconsin. Ex. 30 at 70. Aron did not testify that he ever purchased supplies for the Bantr Project in Janesville, which is almost an hour south of Madison while the Bantr Project is two hours north of Madison. The Court finds that those expenses, totaling $103.58, were not for the Bantr Project.

In sum, the Court finds that $9,535.98 of the expenses on Exhibit 510A were not for supplies related to the Bantr Project or were not paid using Project funds. The remaining $35,585.57 in claimed expenses for supplies were for the Bantr Project and were paid using Bantr Project funds.

*Advertising/Hiring*

The Thompsons claim that TE spent $7,212.33 on advertising and hiring expenses. Ex. 511. TE spent $2,737.20 on branded shirts and other high visibility

clothing. *Id.* at 5. Aron testified that 12 Gauge required TE's workers to wear high visibility clothing while on the Bantr Project site. The remaining expenses were for ads on Indeeed.com and Craigslist. Aron testified that he placed the ads to recruit workers specifically for the Bantr Project.

12 Gauge argues that these expenses are business overhead and are not properly chargeable to the Bantr Project. The Court agrees. Just as TE was expected to come to the job site with saws, nail guns, and ladders, TE was also expected to come with workers ready to do the job. The funds necessary to acquire equipment and labor are overhead expenses. The high visibility clothing worn by TE's workers was also an overhead expense and not a Project-related expense. The Court finds that the $7,212.33 TE spent on advertising and hiring was not related to the Bantr Project.

*Groceries*

Most or all of the crew working for TE on the Bantr Project were not from the Wausau area, so they were away from home, at least during the week. Aron testified that in lieu of paying the workers a per diem amount, he instead purchased groceries and restaurant meals for them. The Thompsons claim that TE spent $2,896.16 at grocery stores buying food for the crew. Ex. 512A. Aron testified that he purchased groceries in Wausau and in the Madison area. He and Nicole also testified that Nicole sometimes purchased groceries for Aron to take to Wausau.

12 Gauge argues that many of the grocery expenses were for the Thompsons personally, and that this is evidenced by an absence of such charges on the Thompsons' personal credit card and bank accounts. Evidence regarding these

accounts was not entered in evidence, and the testimony does not strongly support 12 Gauge's argument. While the Court shares 12 Gauge's concern that the grocery expenses may not have been entirely for Aron and the crew, especially given the pattern of personal expenses on the Thompsons' spreadsheets, the Thompsons gave uncontroverted testimony that Nicole purchased at least some groceries that Aron took to Wausau. Without evidence from which the Court can conclude which grocery expenses were personal and which were for the project crew, the Court cannot parse the expenses. For most of the charges, the only evidence in the record is Aron's testimony that the expenses were for crew meals. *See* 2/13/2025 Tr. at 161:16-162:1. The Court therefore finds that the claimed grocery expenses are Bantr Project expenses in lieu of crew per diem payments. However, the record indicates that a few of the charges were not Project-related or were not paid using Bantr Project funds.

<u>Line 3</u> – On February 13, 2022, Nicole charged $309.53 to the TE American Express at a Pick 'n Save store in Monroe, Wisconsin. Ex. 39 at 66. The Court finds that this charge could not have been for groceries for Aron to take to Wausau, because he was not in Wausau the following week. *See* 2/13/2025 Tr. at 109:18-24, 200:10-12; 2/11/2025 Tr. at 251:10-14. He was instead working on the MBS project. *Id.*

<u>Lines 26 through 28</u> – These lines include expenses at Pick 'n Save and Walgreens between April 21 and April 23, 2022 that were charged to the TE American Express credit card. Ex. 39 at 85. The charges on that statement were

never paid. The Court finds that these expenses, totaling $238.83, were not paid with Bantr Project funds.

In sum, the Court finds that TE paid $2,347.80 in expenses for groceries related to the Bantr Project with Bantr Project funds.

*Meals*

The Thompsons claim that TE spent $4,278.76 on meals at various restaurants for the crew in lieu of per diem payments. Ex. 513A. Many of the expenses listed on Exhibit 513A are at restaurants in the Madison area near the Thompsons' home, two hours away from the Bantr Project site. Aron agreed that expenses at restaurants not near the Project site in Wausau should not have been claimed as Bantr Project expenses. 2/13/2025 Tr. at 101:14-17, 108:21-24. The Court finds that the following expenses, totaling $304.51, were not Project-related: Line 5, Dairy Queen in Fitchburg; Line 15, Burger King in Monroe; Line 18, Dairy Queen in Fitchburg, Line 26, Burger King in Monroe; Line 34, Subway in New Glarus; Line 36, Subway in New Glarus; Line 49, Taco Bell in Monroe; Line 54, Taco Bell in Monroe; Line 59, Pizza Hut in Monroe; Line 66, Subway in New Glarus; Line 69, Culvers in New Glarus; Line 70, Pizza Hut in Monroe; Line 71, Pizza Ranch in Verona; Line 89, Burger King in Monroe. *See* Ex. 30 at 55-70; Ex. 39 at 53-75.

Line 8 is a charge in the amount of $30.00 on April 7, 2022. The TE bank statement includes the following information for the charge, "Purchase EB 2022 WAA STAT 801-413-7200 CA." Ex. 30 at 55. Neither Aron nor Nicole testified regarding this charge. Unlike every other restaurant charge on Exhibit 513A, there

is no location in Wisconsin on the bank entry for the charge, nor is there a decipherable restaurant name. The Court finds that this charge is not a Project-related meal expense.

Lines 75 through 83 are meal expenses charged to the TE American Express credit card between April 14 and April 28, 2022. Ex. 39 at 83-86. These charges on the American Express card were never paid. Therefore, the Court finds that these expenses, totaling $476.01, were not paid using Bantr Project funds.

In sum, the Court finds that TE paid $3,468.24 in expenses for meals related to the Bantr Project with Bantr Project funds.

*Travel/Lodging*

The Thompsons claim that TE spent $59,940.38 on lodging expenses for the crew working on the Bantr Project. Ex. 514. 12 Gauge does not contest these expenses, and they appear to be related to and necessary for the Bantr Project. The Court finds that all the claimed lodging expenses were Project expenses paid for with Bantr Project funds.

*Vehicle Gas & Fuel*

The Thompsons claim that TE spent $5,437.90 on fuel expenses for the Bantr Project, including putting fuel in the equipment used on site and fuel expenses for Aron and the crew to travel to Wausau. Ex. 515. The Court finds that the following expenses were not Project-related or were not paid using Bantr Project funds.

<u>Lines 23 and 76</u> – These lines have charges at gas stations made using Nicole's TE American Express credit card. Ex. 39 at 66, 75. Neither Nicole nor

Aron testified that Nicole ever purchased fuel for TE. The Court finds that these two charges, totaling $141.97, were not related to the Bantr Project.

Lines 27, 28, 50, 51, 72, 113 – These lines are all for cash withdrawals made a various gas stations. Aron did not testify that he ever made fuel purchases using cash. Nor does it make sense that he would pay for fuel in cash on these occasions when there are so many other debit and credit transactions for fuel. The Court finds that these cash withdrawals, totaling $1,083, were not Project-related expenses.

Lines 85, 89, and 91 – These lines were expenses charged to the TE American Express. The entries on the American Express statement indicate that the charges were for "General Alcohol" and "General Tobacco." Ex. 39 at 74. Plainly, charges for alcohol and tobacco could not have been related to the Bantr Project.[7] The Court finds that these charges, totaling $49.77, were not Project-related expenses.

Lines 92 through 112 and 114 through 116 – Twenty-four of the purchases totaling $894.16 were charged to TE's American Express card between April 13 and April 27, 2022. Ex. 39 at 83-86. These charges on that American Express statement were never paid. The Court finds that those expenses were not paid using Bantr Project funds.

---

[7] Aron did not deny that he used the TE American Express card to purchase tobacco and alcohol as indicated on the statement. 2/13/2025 Tr. at 103:5-105:3. The fact that he used the business credit card for such expenses calls into question many of the other small-dollar gas station charges on Exhibit 515 at other outlets that did not include notations regarding the nature of the purchase. However, 12 Gauge did not ask Aron about the other charges, and the Court will not make an inference that any of the other charges were not, in fact, for fuel without any evidence supporting the inference.

In sum, the Court finds that TE paid $3,269.00 in expenses for fuel related to the Bantr Project with Bantr Project funds.

* * * * *

The Court finds that TE spent Bantr Project funds on the following Project-related expenses:

| | |
|---|---:|
| Labor | $169,576.73 |
| Equipment Rental | $24,324.65 |
| Supplies | $35,585.57 |
| Groceries | $2,347.80 |
| Meals | $3,468.24 |
| Lodging | $59,940.38 |
| Fuel | $3,269.00 |
| **Total** | **$298,512.37** |

TE received a total of $475,000 from 12 Gauge for the Bantr Project. Of that amount, $298,512.37 was spent on Bantr Project expenses. The remaining $176,487.63 was not spent on Bantr Project.

## DISCUSSION

12 Gauge's amended complaint includes five separate claims for a declaration of nondischargeability. Dkt. No. 15. The parties stipulated to dismissal of Counts IV and V during the trial. Dkt. No. 76. That leaves three claims. Counts I and II are under 11 U.S.C. § 523(a)(2)(A) and are premised on fraud by omission and overt fraud, respectively. Count III is under 11 U.S.C. § 523(a)(4) and is premised on the Thompsons' responsibility for TE's violation of Wisconsin's theft by contractor law.

12 Gauge presented no argument in its post-trial briefing regarding any fraud by omission based on Aron's alleged failure to disclose TE's financial troubles or the criminal charges against him. The Court therefore concludes that 12 Gauge

has abandoned Count I, and the Court will grant judgment in favor of the Thompsons on Count I. *See Palmer v. Marion County*, 327 F.3d 588, 597-98 (7th Cir. 2003) ("[B]ecause [the plaintiff] failed to delineate his negligence claim in his district court brief in opposition to summary judgment or in his brief to this Court, his negligence claim is deemed abandoned." (collecting cases)); *see also McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1010 (5th Cir. 2023) ("[A] party abandons a claim by failing to defend it in response to motions to dismiss and other dispositive pleadings."); *Conner v. Hardee's Food Sys., Inc.*, 65 F. App'x. 19 (6th Cir. 2003) (finding that plaintiffs had abandoned their claim "[b]ecause [they] failed to brief the issue before the district court").

On the remaining two claims, the Court concludes that 12 Gauge did not sufficiently prove its claim that the Thompsons owe a debt that is not dischargeable under 11 U.S.C. § 523(a)(2)(A) because 12 Gauge did not justifiably rely on any statement made by the Thompsons. The Court further concludes that 12 Gauge did prove that TE is liable for theft by contractor under Wis. Stat. § 779.02(5), that the Thompsons are both responsible agents of TE, and that the resulting debt owed by the Thompsons is not dischargeable under 11 U.S.C. § 523(a)(4).

**CLAIM UNDER 11 U.S.C. § 523(a)(2)(A)**

12 Gauge objects to the discharge of a debt owed to it under 11 U.S.C. § 523(a)(2)(A), which excepts from discharge debts for money "obtained by . . . false pretenses, a false representation, or actual fraud . . . ." To have a debt declared nondischargeable under § 523(a)(2)(A), the creditor must show: (1) that the debtor made a false representation or omission, that he either knew was false or made

with reckless disregard for the truth, (2) that the debtor had an intent to deceive or defraud, and (3) that the creditor justifiably relied on the representation or omission. *Reeves v. Davis (In re Davis)*, 638 F.3d 549, 553 (7th Cir. 2011); *see also Ojeda v. Goldberg*, 599 F.3d 712, 716–17 (7th Cir. 2010). The creditor must prove each element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). "[E]xceptions to discharge are to be construed strictly against a creditor and liberally in favor of the debtor." *Goldberg Secs., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992).11 U.S.C. § 523(a)(2)(A).

12 Gauge alleges that the Thompsons owe a nondischargeable debt for fraud or civil theft based on Aron's representation that TE had or could have "20 plus guys" available to work on the Bantr Project and based on the lien waivers that Aron and Nicole signed. Both bases for 12 Gauge's claim fail on the reliance element under § 523(a)(2)(A). Therefore, the Court need not consider the basis or scope of any debt that the Thompsons may owe under state law because the debt was discharged. *See, e.g.*, *Holton v. Zaidel (In re Zaidel)*, 553 B.R. 655, 658 n.1 (Bankr. E.D. Wis. 2016) ("The court's decision addresses only the dischargeability issues governed by federal law. Because the court finds that the alleged debt is dischargeable, regardless of the amount, it need not determine any remaining issues of state law, such as liability or the amount of damages, if any.").

Justifiable reliance requires that the creditor not "'blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" *Ojeda v. Goldberg*,

599 F.3d 712, 717 (7th Cir. 2010) (quoting *Field v. Mans*, 516 U.S. 59, 71 (1995)). "The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him." *See Ollerman v. O'Rourke Co.*, 94 Wis. 2d 17, 43, n.26 (1980) (quoting 3 Restatement (Second) of Torts, § 541 (1977)). Consistently, "[a] plaintiff cannot justifiably rely on a misrepresentation while ignoring contradictory information that he or she knew or could have discovered." *Osowski v. Howard*, 2011 WI App 155, ¶27, 337 Wis. 2d 736, 807 N.W.2d 33 (unpublished opinion) (citing *Ritchie v. Clappier,* 109 Wis. 2d 399, 404 (Ct. App. 1982)).

Section 523(a)(2) requires that the underlying debt be for "money, property, services . . . *obtained by*" fraud. 11 U.S.C. § 523(a)(2) (emphasis added). A nondischargeable debt under § 523(a)(2) does not arise upon the signing of a contract induced based on a fraudulent representation. The debtor, or a third party for whom the debtor is responsible, must obtain money, property, or services pursuant to the fraudulently-induced contract. *See Nunnery v. Roundtree (In re Rountree)*, 330 B.R. 166, 172 (E.D. Va. 2004), *aff'd*, 478 F.3d 215 (4th Cir. 2007) (noting that the creditor must prove that "the debtor fraudulently took something of value, such as money, property, or services, from the creditor"); *see also Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998) ("Once it is established that specific money or property has been obtained by fraud, however, 'any debt' arising therefrom is excepted from discharge."). 12 Gauge argues that the Thompsons are liable for fraud or civil theft under Wisconsin law based on (1) Aron's statements to Hudack

and Worthington that he would have "20 plus guys" working on the Bantr Project; (2) the statements in TE's pay applications that TE "certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due"; and (3) the representations in the lien waivers signed by Aron and Nicole that "subcontractors had already been pad for the work done and that they needed new funds to continue progressing the project." Dkt. No. 96 at 29, 51.

With respect to Aron's statement about "20 plus guys" working on the project, 12 Gauge was aware that TE did not have 20 or more crew members when TE started work on the Project. TE started work on the Project in late January 2022, and 12 Gauge did not release the first payment to TE until February 21, 2022. 12 Gauge employed a site superintendent who was always or frequently at the site and likely observed the number of TE workers on the site each day. The site sign-in sheets maintained by 12 Gauge for January 28 and February 1, 2022 indicate that only a handful of TE workers were on site those days. Ex. 502 at 2-3. In addition, by February 25, 2022, just a few days after 12 Gauge released the first payment to TE, Hudack complained that "Thompson Exteriors has not yet once provided the amount of men that was discussed and scheduled for." Ex. 68. He also said that 12 Gauge had released the first payment "even though [the lack of the promised

number of crew] had been occurring since 2/7/22" and that "[p]roduction and manpower is nowhere near where it was verbally agreed to be." *Id.* 12 Gauge knew that TE did not have a crew of "20 plus guys" ready to work on the Bantr Project, but it chose to pay TE anyway. 12 Gauge therefore did not justifiably rely on Aron's representations about the number of crew members when it provided payments to TE.

With respect to the statements in the pay applications and lien waivers, TE submitted its first pay application on January 19, 2022, before it even started work on the Bantr Project. 12 Gauge knew that the first pay application for $260,000 was a "mobilization payment," and that TE would not have paid its laborers and suppliers before receiving the funds. Ex. 68 ("We allowed an *extremely* large mobilization dollar amount to be applied for in Pay Application #1, prior to any work being performed."). Indeed, that was the whole point of the first series of payments. On Friday, February 25, 2022, Hudack noted that TE "is at about 4-5% complete" but on Monday, February 28, 2022, 12 Gauge released an additional $75,000 payment to TE. With that payment, 12 Gauge had released over 17% of the total original Contract price of $1,060,975, but 12 Gauge knew that only 4-5% of the work had been completed. 12 Gauge could not have believed that TE had completed 17% of the work when 17% of the work was not done.

By March 22, 2022, TE wanted to submit another pay application. With the amount requested in the February pay application, TE had requested 34.87% of the original Contract amount, but TE was "no where [sic] near that percentage

complete" to justify another pay application. Ex. 73. 12 Gauge was concerned enough about the progress that Worthington said, "I think all of us need to have a real Heart to Heart chat about the progress on the job site, versus the percentage complete on the pay request." Ex. 69. The site superintendent even commented that Nicole "doesn't understand how far behind her company is and how they are destroying our schedule." Ex. 72. 12 Gauge released a $70,000 payment to TE the same day, even though Hudack knew TE had not paid the hotel bill and he suspected that TE's labor subcontractors had not been paid. Ex. 74.

On March 29, 2022, the site superintendent sent Hudack a picture of the work TE had completed. Ex. 75. Hudack estimated that TE had completed just 12-13% of the work by that point. TE had been paid $330,000, which was approximately 31% of the original Contract price.

By April 11, 2022, 12 Gauge was concerned enough about TE's progress that it executed a change order with TE to reduce the original Contract price by $400,000. Ex. 78. Despite the change order, 12 Gauge continued to have concerns about TE's progress on the work. On April 19, 2022, Aron sent a proposed timeline and budget in response to 12 Gauge's request. Ex. 82. Hudack had serious concerns about the timeline. Ex. 84. Worthington told Nicole that "[T]hompson [E]xteriors is behind schedule, we are concerned about your manpower, and the money left in your contract." Ex. 86. 12 Gauge released payments to TE on April 21 and April 29, 2022 anyway.

12 Gauge then requested that TE send a list of expenses on the Project. It took two or three weeks for TE to provide the information. Ex. 97. On May 13, 2022, Hudack reviewed the information that TE provided and had serious concerns about where the money was spent. Ex. 98. He concluded that TE should have over $97,000 left in Project funds. Despite Hudack's concerns, 12 Gauge released another $30,000 payment to TE on May 20, 2022.

12 Gauge knew that TE was behind schedule from the start and that it had not completed the percentage of the work suggested by its pay applications and lien waivers. 12 Gauge could not have relied on any statements in those documents indicating that TE had completed and paid for the amount of work suggested by the statements in the pay applications and lien waivers.

Because 12 Gauge did not justifiably rely on statements made by Aron before signing the Contract or by Aron or Nicole in the pay applications or lien waivers, any money obtained through those statements cannot be nondischargeable under 11 U.S.C. § 523(a)(2)(A). The Court will enter judgment in favor of the Thompsons on Count II of the amended complaint.

**CLAIM UNDER 11 U.S.C. § 523(a)(4)**

In Count III of its amended complaint, 12 Gauge seeks a declaration of nondischargeability under 11 U.S.C. § 523(a)(4). That section excepts from discharge debts "for fraud or defalcation while acting a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). "To establish that a debt is non-dischargeable under section 523(a)(4), a creditor must show (1) that the debtor acted as a fiduciary to the creditor at the time the debt was created, and (2) that the

debt was caused by fraud or defalcation." *In re Berman*, 629 F.3d 761, 765-66 (7th Cir. 2011). The second element requires "intentional conduct that the fiduciary knows is improper" or reckless conduct where "the fiduciary consciously disregards (or is willfully blind to) a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty." *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273-74 (2013). "The objecting creditor bears the burden of proving by a preponderance of the evidence that an exception to discharge applies." *Estate of Cora v. Jahrling (In re Jahrling)*, 816 F.3d 921, 925 (7th Cir. 2016) (citing *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991)).

The underlying debt at issue is based on a theft by contractor claim under Wis. Stat. §§ 779.02(5). Wisconsin's theft by contractor statute provides in relevant part:

> THEFT BY CONTRACTORS. The proceeds of any mortgage on land paid to any prime contractor or any subcontractor for improvements upon the mortgaged premises, and all moneys paid to any prime contractor or subcontractor by any owner for improvements, constitute a trust fund only in the hands of the prime contractor or subcontractor to the amount of all claims due or to become due or owing from the prime contractor or subcontractor for labor, services, materials, plans, and specifications used for the improvements, until all the claims have been paid, and shall not be a trust fund in the hands of any other person. The use of any such moneys by any prime contractor or subcontractor for any other purpose until all claims, except those which are the subject of a bona fide dispute and then only to the extent of the amount actually in dispute, have been paid in full or proportionally in cases of a deficiency, is theft by the prime contractor or subcontractor of moneys so misappropriated and is punishable under s. 943.20. If the prime contractor or subcontractor is a corporation, limited liability company, or other legal entity other than a sole proprietorship, such misappropriation also shall be deemed theft by any officers,

> directors, members, partners, or agents responsible for the misappropriation.

Wis. Stat. § 779.02(5).

The statute is designed to "assist subcontractors and their subcontracts and suppliers in getting paid and to protect owners and prime contractors from paying twice." *Kraemer Bros. v. Pulaski State Bank*, 138 Wis. 2d 395, 402, 406 N.W.2d 379, 383 (1987). "Until all claims for labor and materials are paid, the contractor's interest in the money paid to him by the owner to the extent of the amount of all claims due and to become due for that project is merely as a trustee." *State v. Blaisdell*, 85 Wis. 2d 172, 178, 270 N.W.2d 69, 73 (1978).

The statute is akin to strict liability—it is not necessary to show that the contractor intended to misappropriate the funds. *See Burmeister Woodwork Co., Inc. v. Friedel*, 65 Wis. 2d 293, 301, 222 N.W.2d 647, 652 (1974) ("In a civil action for conversion of trust funds it is not necessary to show wrongful intent to defraud."). In addition, an individual officer or agent of a corporate entity responsible for the misappropriation is personally liable for the damages caused. *Capen Wholesale, Inc. v. Probst*, 180 Wis. 2d 354, 369-70 509 N.W.2d 120, 126 (Ct. App. 1993).

The Seventh Circuit has held that the fiduciary obligation imposed under Wisconsin's theft by contractor statute is sufficient to establish that a debtor acted as a fiduciary under § 523(a)(4). *See Stoughton Lumber Co., Inc. v. Sveum*, 787 F.3d 1174, 1177 (7th Cir. 2015). Neither party disputes this premise. Thus, establishing the underlying debt through violation of Wis. Stat. § 779.02(5) will also establish the first element of § 523(a)(4).

The theft by contractor statute provides that a violation of Wis. Stat. § 779.02(5) is also a violation of Wis. Stat. § 943.20, a criminal statute. Wisconsin law allows a person damaged by criminal conduct under § 943.20 to pursue a civil claim based on that conduct. *See* Wis. Stat. § 895.446(1). If a plaintiff can prove the elements of a civil theft by contractor, along with the specific criminal intent element required under § 943.20, then the plaintiff can seek the additional remedies in § 895.446(3), including attorney's fees and costs and treble damages. *Tri-Tech Corp. of Am. v. Americomp Servs., Inc.*, 2002 WI 88, ¶ 26, 254 Wis. 2d 418, 431, 646 N.W.2d 822, 829. 12 Gauge argues that the Thompsons committed criminal theft by contractor under § 943.20, and that they are liable to 12 Gauge under Wis. Stat. § 895.446.

The elements of criminal theft by contractor are: "(1) the defendant acted as a prime contractor[8]; (2) the defendant received money for the improvement of land from the owner or a mortgagee; (3) the defendant intentionally used the money for purposes other than the payment of bona fide claims for labor or materials prior to the payment of such claims; (4) the use was without the owner or mortgagee's consent, and contrary to the defendant's authority; (5) the defendant knew the use was without consent and contrary to his authority; and (6) the defendant used the money with the intent to convert it to his own use or the use of another." *Tri-Tech*

[8] The *Tri-Tech* case involved a prime contractor, but this element is satisfied if the plaintiff proves that the defendant "entered into an agreement for the improvement of land." *Soria v. Classic Custom Homes of Waunakee, Inc.*, 2019 WI App 48, ¶ 39, 388 Wis. 2d 474, 934 N.W.2d 570 (unpublished) (citing WIS JI-CIVIL 2722 Theft by Contractor).

*Corp.*, 2002 WI 88, ¶ 26 (quotation omitted). The plaintiff must prove these elements "by a preponderance of the credible evidence." *Id.* ¶ 30. *See also Grogan*, 498 U.S. at 283 ("The validity of a creditor's claim is determined by rules of state law."). Because a claim under Wis. Stat. §§ 895.446(1) and 943.20 requires proof of criminal intent, satisfaction of the intent components of a theft by contractor claim under those statutes would also satisfy the second element of a nondischargeability claim—i.e., there would be proof that the debtor committed fraud or defalcation by "intentional conduct that the fiduciary knows is improper." *Bullock*, 569 U.S. at 273-74.

**1. TE as a Contractor**

The Thompsons do not dispute that TE was engaged as a subcontractor on the Bantr Project, and that 12 Gauge sufficiently proved this element. *See* Dkt. No. 97 at 11. Even without an agreement by the Thompsons, the evidence overwhelmingly supports a conclusion that 12 Gauge proved this element. The Contract between 12 Gauge and TE plainly was for work on a project that was an improvement of land.

**2. Receipt of Money from the Owner or Mortgagee**

The second element requires proof that TE received funds from an owner or mortgagee for the project to improve land. *Tri-Tech*, 2002 WI 88, ¶ 26. The Thompsons dispute that 12 Gauge sufficiently proved this element. The evidence supports a conclusion that the funds TE received from 12 Gauge were from the owner or mortgagee of the land to which the Contract relates.

Worthington testified that Bantr on Elm LLC owns the real estate where the Bantr Project was to be constructed. He also testified that 12 Gauge was engaged as the general contractor for the Bantr Project pursuant to a contract between 12 Gauge and Bantr on Elm. 2/10/2025 Tr. at 27:15-28-17; *see also* Ex. 1. Article V of that Contract governs progress payments to 12 Gauge, and Worthington testified that 12 Gauge followed the procedure in the Contract. That is, 12 Gauge submitted pay applications to Bantr on Elm that included pay applications from 12 Gauge's subcontractors, including TE, and then 12 Gauge paid its subcontractors, including TE, when it received payment from Bantr on Elm.

TE submitted pay applications to 12 Gauge in January 2022 for $260,000, in February 2022 for $110,000, in March 2022 for $130,000, and in April for $130,000. Exs. 52-54, 62, 65-66, 76, 93. All those pay applications were included in 12 Gauge's pay applications to Bantr on Elm. *See* Ex. 7 at 91; Ex. 8 at 57; Ex. 9 at 60; Ex. 10 at 95.[9] TE understood that all the funds it received from 12 Gauge ultimately came from the owner of the Bantr Project. When Aron demanded payment of TE's first application of $260,000 on February 21, 2022, Hudack responded that 12 Gauge was expecting payment from the owner that day, but that the bank was closed due to the Presidents Day holiday. Ex. 61. Before TE received the initial check for $110,000, Hudack told Aron that 12 Gauge "did receive a partial payment today for

[9] The numbers on the TE pay application attached to 12 Gauge's pay application are different from the numbers on the pay application that TE submitted to 12 Gauge. *Compare* Ex. 93 *with* Ex. 10 at 95. No witness testified regarding the reason for the discrepancy, but the Court nevertheless concludes that the record supports a finding that all the funds TE received from 12 Gauge were from Bantr on Elm or its lender.

the draw." *Id.* The Court concludes that 12 Gauge sufficiently proved that the funds TE received were from the owner of the Bantr Project.

The Thompsons argue that "irregularities" in the 12 Gauge pay applications to Bantr on Elm and in the amounts paid to TE are sufficient to question whether the funds really came from the owner. For example, they say that 12 Gauge paid TE only $185,000 by the end of February 2022, so 12 Gauge could not and should not have said in its March 1, 2022 pay application to Bantr on Elm that it had paid $260,000 for rough carpentry nor should 12 Gauge have requested another $110,000 for TE. The Thompsons misunderstand both the math and the timing. TE's first pay application was for $260,000 submitted in late January 2022. TE received that amount across three payments: $110,000 on February 21, 2022, $75,000 on February 28, 2022, and $75,000 on March 8, 2022. Ex. 129 at 1-3. TE's second pay application submitted in February was for $110,000. Exs. 62-63. TE received that amount across two payments received on March 23, 2022 and April 12, 2022. Ex. 129 at 4-5. TE's third pay application submitted in March was for $130,000. Ex. 76. TE received payments of $30,000 on April 21, $45,000 on April 29, and $30,000 on May 20, 2022. Ex. 129 at 6-8. TE did not receive the entire $130,000 requested in the March pay application, but that was because TE's work on the Project was so far behind schedule that further payments were not warranted. TE's fourth pay application submitted in April was for $130,000. Ex. 93. TE received payments of $80,000 on May 20, 2022 and $50,000 on June 6, 2022. Ex. 129 at 9-10. The

payments were made out to TE and All Seasons Drywall because TE was delinquent in paying its subcontractor.

The Thompsons also argue that 12 Gauge represented in its own pay applications to Bantr on Elm that it had paid TE for the prior pay applications when TE had not yet received those payments. Whether 12 Gauge's representations were accurate does not change the fact that the money TE received was from the owner or its lender. Moreover, as the Thompsons were well aware (and complained about at the time), the pay application process operates on a time lag. 12 Gauge was required to submit its pay applications by the first of the month and would not receive payment from the owner until the 21st of the month. 12 Gauge necessarily had to anticipate what amounts would need to be paid each month. By the time 12 Gauge received payment from Bantr on Elm in March 2022 for the February pay application, it had already disbursed the entire $260,000 to TE requested in the January pay application. Similarly, by the time it would have received payment in April for the March pay application, 12 Gauge had disbursed the entire $110,000 TE requested in the February pay application.

**3. Use of Project Money for Other Purposes Without Consent**

The theft by contractor statute requires that funds received from an owner or mortgagee can be used only "for labor, services, materials, plans, and specifications" for the project. Wis. Stat. § 779.02(5). "Using the funds for some other purpose—whether personal or corporate—violates the statute . . . ." *Cap. City Sheet Metal, Inc. v. Voytovich*, 217 Wis. 2d 683, 689, 578 N.W.2d 643, 646 (Ct. App. 1998); *see also State of Wisconsin v. Sobkowiak*, 173 Wis. 2d 327, 334, 496 N.W.2d 620, 623

(Wis. Ct. App. 1992) ("The statute imposes the trust to insure that one who receives money for [the purpose of improvements on property] uses it to that end.").

The evidence amply indicates that TE used Bantr Project funds for other purposes without the consent of Bantr on Elm. This use occurred with the very first payment that TE received. TE deposited $113,458.00 on February 22, 2022, which included the first payment of $110,000 from 12 Gauge. Ex. 30 at 55. The same day, TE authorized three payments to American Express, along with several other electronic payments, and Nicole wrote several checks. *Id.* The payments to American Express covered the entire balance for the statement ending on February 11, 2022, which included charges unrelated to the Project. The American Express charges covered by the February 22 payments, along with the other non-Project payments made on February 22 totaled at least $52,475.18:

| | |
|---|---:|
| Brunsell Lumber (AmEx charge on 1/28/2022) | $5,000.00 |
| RealTruck (AmEx charge on 1/29/2022) | $1,472.78 |
| Fiesta Winery (AmEx charge 2/1/2022) | $208.40 |
| Evolve Hair Salon (AmEx charge 2/10/2022) | $200.20 |
| Internal Revenue Service | $1,500.00 |
| All Seasons Drywall (check no. 2254) | $29,250.00[10] |
| Randy Burrow (check no. 2255) | $6,015.79 |
| WI Dept of Revenue (check no. 2256) | $1,608.00 |
| City of Monroe (check no. 2262) | $1,184.17 |

[10] The total amount of the check was $50,786.00. Ex. 31 at 29. The Thompsons concede that only $21,536.00 of that amount was for the Bantr Project. *See* Ex. 508A.

| | |
|---|---|
| E-checks or transfers not claimed as Project expenses | $6,035.84 |
| **Total** | **$52,475.18** |

Ex. 30 at 55-56; Ex. 31 at 29-31, 62; Ex. 39 at 56.

TE's checking account was overdrawn when it made a deposit of $113,458.00 on February 22. All or nearly all the funds for the payments above came from the $110,000 payment of Bantr Project funds. TE did not have authority from either 12 Gauge or Bantr on Elm to use the funds for these expenses that were unrelated to the Bantr Project.

The Thompsons' only response to this clear evidence is an argument that Aron was entitled to compensation for his own labor on the Bantr Project. They say that, in lieu of paying himself a wage, TE spent funds paying the Thompsons' personal expenses and covering its general business expenses. Though he owns TE, Aron may be entitled to receive compensation for his services in proportion to the other subcontractors. *See State v. Keyes*, 2008 WI 54, ¶¶ 25-34, 309 Wis. 2d 516, 750 N.W.2d 30. Even accepting this argument for the moment, TE paid far more in non-Project expenses on February 22 than the compensation that Aron could possibly have been entitled to receive at that point. Aron started work on the Bantr Project the week of January 17. By February 22, he had worked, at most, four full weeks on the Project – the week of January 17, the week of January 24, the week of January 31, and the week of February 7. He testified that he was working at the MBS Project the week of February 14. *See* 2/11/2025 Tr. at 251:10-14. Aron said that his hourly rate was $55 per hour and that he often worked 10 hour days, and

that he sometimes worked weekends. *Id.* at 121:3-11. The maximum compensation Aron would have earned in those four weeks was $13,200—$55/hr x 60 hrs/week x 4 weeks. If we assume that Aron had earned $13,200 by February 22, the payments authorized by TE that day exceeded Aron's claim of earned compensation by ***over $35,000***.

TE's practice of far overspending Aron's purported compensation continued throughout the Bantr Project. There were 17 weeks between the week of February 21 and the week of June 13, 2022. Even assuming for the moment that Aron worked 60 hours on the Bantr Project each and every week at $55 per hour, Aron would have earned just $56,100. TE spent way more than that on expenses unrelated to the Bantr Project, including the following:

| | | |
|---|---|---|
| 2/28/2022 | Brunsell Lumber (check no. 2265) | $9,000.00 |
| 2/28/2022 | Tamarack Materials (check no. 2266) | $29,460.88 |
| 3/1-31/2022 | Knight Capital Charges | $6,422.29 |
| 3/2/2022 | WI DOT | $126.00 |
| 3/4/2022 | Brunsell Lumber (check no. 2267) | $1,614.36 |
| 3/15/2022 | Discover Credit Card | $1,493.23 |
| 3/15/2022 | Capital One Credit Card | $5,367.86 |
| 3/16/2022 | Amazon Credit Card | $1,447.30 |
| 3/21/2022 | Gander | $861.79 |
| 3/21/2022 | Discover Credit Card | $1,478.18 |
| 3/22/2022 | Internal Revenue Service | $1,500.00 |
| 3/31/2022 | Venmo transfer to unknown recipient | $500.00 |
| 4/1-29/2022 | Knight Capital Charges | $5,175.06 |
| 4/4/2022 | Trading Post, LLC (AmEx charges) | $1,867.32 |
| 4/4/2022 | Mortgage Payment | $2,309.63 |
| 4/11-29/2022 | Overdraft and Returned Item Fees | $1,080.00 |

| | | |
|---|---|---|
| 4/22/2022 | Internal Revenue Service | $1,500.00 |
| 4/22/2022 | IMT Insurance (check no. 2271) | $808.60 |
| 4/25/2022 | Mortgage Payment | $2,309.63 |
| 4/25/2022 | Badgerland Supply (check no. 2273) | $14,171.67 |
| 5/2-31/2022 | Knight Capital Charges | $4,728.30 |
| 5/2/2022 | Transfer to Thompson personal account | $5,000.00 |
| 5/6/2022 | Transfer to Thompson personal account | $15,000.00 |
| 5/23/2022 | Internal Revenue Service | $1,500.00 |
| 5/23/2022 | Mortgage Payment | $2,309.63 |
| 5/23/2022 | Loan Payment | $963.45 |
| | **Total** | **$115,916.18** |

Ex. 30 at 59, 62, 65-70; Ex. 31 at 30, 31, 37.

In March, April, and May 2022, TE received $31,000 in funds unrelated t the Bantr Project. *See* Ex. 30 at 59 ($22,000 on 3/10/2022); *id.* at 68 ($9,000 on 5/2/2022). After accounting for those funds, TE spent at least $84,916.18 of funds received from 12 Gauge for the Bantr Project on expenses unrelated to the Project. This total does not account for the myriad small purchases made from the TE account that were wholly unrelated to the Bantr Project, including cash withdrawals, charges at restaurants near the Thompsons' home, and other unidentified payments. Even if Aron was entitled to $56,100 in compensation, TE far outspent that.

The figures above assume that Aron in fact worked 60 hours a week over the course of the Bantr Project. The evidence indicates that he did not work that much. Soon after TE started work on the Project, 12 Gauge complained that Aron was not present at the job site during the hours that he should have been working. *See* Exs.

67, 68, 75. 12 Gauge's complaints in this regard continued throughout the course of TE's work on the Project. *See* Ex. 85, 104. The Thompsons did not dispute that Aron was not on site when 12 Gauge complained he was not there.

Aron may be entitled to proportionate payment for his labor, but there is no information in the record from which the Court can make a finding regarding the actual number of hours that Aron worked on the Bantr Project. Aron kept no contemporaneous records regarding the time he spent working on the Project, and there is no evidence in the record regarding the hours he worked other than his estimate that he worked "a little over a thousand hours" on the Bantr Project. 2/13/2025 Tr. at 120:23-121:1. This estimate is not credible based on Aron's undisputed and frequent absences from the work site. Without more information, the Court cannot conclude that the non-Project expenses paid with Bantr Project funds represent compensation for Aron's labor. And, as noted, the payments for non-Project expenses far exceeded the value of Aron's labor.

**4. Agents Responsible for the Misappropriation**

A claim under Wis. Stat. § 779.02(5) does not require proof of intent. *Burmeister,* 65 Wis. 2d at 301-02. Violation of the trust fund statute is enough to trigger liability, even if the contractor did not intend to breach a fiduciary duty. If the contractor is a corporate entity such as an LLC like TE, the statute provides that any misappropriation by the entity "also shall be deemed theft by any officers, directors, members, partners, or agents responsible for the misappropriation." Wis. Stat. § 779.02(5).

Aron was the sole member of TE, and the Thompsons agree that he necessarily is responsible for any misappropriation under the theft by contractor statute. They argue, however, that Nicole is not an agent of TE who can be responsible for the misappropriation. The Court disagrees.

In determining whether an individual is responsible for the misappropriation, there is "no requirement that the corporate officer responsible for the misappropriation of the funds must receive a benefit from his acts before he may be held personally liable." *Burmeister*, 65 Wis. 2d at 298. "The only important point is that [the funds received by the contractor] were used for purposes other than the payment of claims as provided in the statute." *Id.* A corporate agent may be responsible for theft by contractor if he allows the corporate trust funds to be spent contrary to the statute. *See Capen Wholesale, Inc. v. Probst*, 180 Wis. 2d 354, 363-65, 509 N.W.2d 120, 124 (Ct. App. 1993).

Despite her signature appearing on numerous documents and checks written from the TE account and her various correspondence with 12 Gauge, the Thompsons testified that Nicole was nothing more than a scrivener carrying out Aron's specific instructions. This testimony is not credible. There is plenty of evidence that Nicole was responsible for the misappropriation of the Bantr Project funds.

Nicole was heavily involved in the Bantr Project from the beginning. On January 20, 2022, she created an email address for herself to correspond regarding TE matters, and the Thompsons instructed 12 Gauge to email Nicole regarding

"payment apps/issues." Ex. 56. Nicole was responsible for preparing all the pay applications for TE. On February 24, 2022, she prepared and sent to 12 Gauge a payment application, saying "[w]e want to draw $215,000," and she signed her email as "Business Manager" for TE. Ex. 62. When 12 Gauge responded that TE could request only $110,000, Nicole responded just three minutes later asking why and saying "I don't think there was anything in the contract saying that there was a limit as to how much we can request." Ex. 66. Nicole did not discuss the issue with Aron before responding, nor did Aron instruct her what to say in response. Rather, Nicole took responsibility for communicating regarding this substantive issue with 12 Gauge.

The next day, on February 25, 2022, after 12 Gauge sent emails regarding Aron not being at the Project site, Nicole wrote a lengthy email addressing many substantive issues. She said, "I am stepping in here at the current moment due to some things I am seeing . . . ." Ex. 67. This correspondence was not written by someone who was merely following Aron's direction at every turn. Nicole was deeply involved in the Bantr Project at that point.

A few weeks later, when the problems on the Bantr Project continued to persist, Nicole joined a video conference meeting on March 22, 2022 with Aron, Hudack, and Worthington. There would be no reason for her to join that meeting if she was not responsible for or involved in any of the operations of TE. Indeed, Nicole was so involved in TE's operations that she had an outburst during the conference that she later apologized for over email. Ex. 72.

On Thursday, April 21, 2022, Aron told Nicole that TE would not receive a payment from 12 Gauge until the following week. If Nicole were a mere assistant taking all her direction from Aron, she would have accepted that and let him handle it. She did not. Instead, she wrote to Worthington and Hudack demanding payment the next day: "I need to have this payment tomorrow (Friday) otherwise I am unable to pay labor and continue moving this job forward." Ex. 85. She continued to have a back and forth conversation with Worthington regarding the issue without any input from Aron. *Id.* In late May 2022, Nicole demanded information from Hudack in May 2022 regarding TE's scope of work, and she had an extended email discussion with him regarding TE's finances and work to be completed. Ex. 104. Again, if Nicole were not an agent of TE, she would not have been so heavily involved in addressing 12 Gauge's complaints.

Nicole also was directly involved in TE's finances. Nicole was an authorized signatory on TE's checking account, she had a debit card for that account, and she had a credit card for the TE American Express account. She wrote many checks from the TE checking account, and she signed lien waivers on behalf of TE.

These are not the actions of someone who was not directly involved in TE's business. Given her significant role in the business, Nicole is someone who is responsible for the misappropriation.

### 5. Knowledge of Lack of Consent and Intent to Convert the Funds

A claim under Wis. Stat. §§ 893.446 and 943.20 requires proof of specific intent. *Tri-Tech Corp.*, 2002 WI 88 ¶¶ 28-30. Similarly, a claim under § 523(a)(4) seeking to have such a debt under state law declared non-dischargeable requires

proof of "intentional conduct that the fiduciary knows is improper" or reckless conduct where "the fiduciary consciously disregards (or is willfully blind to) a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty." *Bullock*, 569 U.S. at 273-74 (cleaned up). "The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves *a gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation." *Id.* (cleaned up). "[N]egligence is not sufficient to show defalcation within the meaning of § 523(a)(4)." *Jahrling*, 816 F.3d at 926.

To intentionally disregard a fiduciary duty, the fiduciary necessarily must know that he has a fiduciary duty. *See Milwaukee Builders Supply, Inc. v. St. Antoine (In re St. Antoine)*, 533 B.R. 743, 749 (Bankr. E.D. Wis. 2015). In the context of theft by contractor, the contractor must know that Wisconsin law imposes a fiduciary duty on funds received from owners or their lenders for the construction project *and* the contractor must violate that duty with the requisite intent. The Court concludes that 12 Gauge sufficiently proved the Thompsons' knowledge and intent under the Wisconsin statutes and § 523(a)(4).

Both Aron and Nicole were aware of the fiduciary obligations imposed by Wis. Stat. § 779.02(5) before the Bantr Project started. In March 2021, Aron took a licensing course during which he learned about the theft by contractor law, and he was criminally charged with theft by contractor under Wis. Stat. § 943.20(3)(a). Ex. 139. Though he resolved the matter and was not convicted of theft by contractor,

the charge gave him actual knowledge of the fiduciary requirements of the statute. Nicole also was aware of the requirements based on the charge against Aron.

The Court concludes that both Aron and Nicole knew TE was violating the theft by contractor statute and acted with the requisite intent to violate the statute. TE deposited the first payment from 12 Gauge into its checking account on February 22, 2022. As discussed, that payment covered an overdraft in the account that was not entirely caused by expenses for the Bantr Project. The Thompsons then caused TE to immediately make a $1,500 payment to the IRS, Nicole wrote four checks on February 22 for expenses unrelated to the Bantr Project in the total amount of $38,720.96 ($6,015.79 to Randy Burrow, $1,847.17 to the City of Monroe, Wisconsin, $1,608.00 to the Wisconsin Department of Revenue, and $29,250.00 of the payment to All Seasons Drywall); and the Thompsons allowed Knight Capital to make daily withdrawals totaling $1,116.92 for the rest of February. The Thompsons also made large payments to the TE American Express card on a balance that included thousands in charges wholly unrelated to the Bantr Project. These payments far exceeded any compensation Aron could have been owed for his labor before February 22. The Thompsons knew that the balance in the TE checking account was negative when they received the first payment for the Bantr Project, and they knew that only $3,458 of the February 22 deposit was not Bantr Project funds. Yet they caused TE to immediately spend more than $40,000 on expenses unrelated to the Bantr Project.

This pattern continued. Immediately after TE received $75,000 from 12 Gauge on February 28, 2022, Nicole wrote a check for $9,000 to Brunsell Lumber and a check for $29,460.88 to Tamarack Materials. Ex. 31 at 30-31. Aron plainly was not owed over $38,000 for his labor before February 28, 2022. Moreover, the memo line on the check to Tamarack Materials says, "Nov 2021 Invoices." Ex. 31 at 31. Nicole (and Aron as the sole member of TE) knew that they were spending the money from 12 Gauge for the Bantr Project to pay for the costs from other projects.

Based on these substantial payments made early on, the Court infers that the Thompsons knew or consciously disregarded the ongoing risk that TE was using Bantr Project funds for non-Project expenses. They knew that Knight Capital was making daily withdrawals from the TE checking account to the tune of several thousand dollars per month. They also knew that TE was funding monthly payments to the IRS, their personal mortgage payments, other personal expenses, and payments to suppliers on other projects with Bantr Project funds.

Aron and Nicole's knowledge and intent is supported by their statements to 12 Gauge during the Project. On February 25, 2022, Nicole wrote a lengthy email complaining that TE had not been paid the full $260,000 that TE requested in the first pay application. Ex. 67. She said, "If we cannot draw the amount we need then we cannot pay labor and we cannot have that many guys working." *Id.* At that point, she knew that TE had used more than $40,000 from the first payment of $110,000 received on February 22 to cover non-Project expenses. Despite claiming that 12 Gauge had given TE insufficient payments to fund labor, Nicole knew that

much of the money was unavailable for TE to pay labor because TE had used the money for other purposes.

On March 22, 2022, during a meeting with Hudack and Worthington, Aron and Nicole stated that TE would use the next payment from 12 Gauge to pay an overdue hotel bill. The payment of $58,372.00 that TE wrote to the hotel did not clear until April 8, 2022. *See* Ex. 514; Ex. 30 at 67. In the meantime, the Thompsons continued to allow Knight Capital to take daily withdrawals from the TE checking account, they made a payment of $1,500 to the IRS, and they paid the balance on the TE American Express card, which included several purchases that were unrelated to the Bantr Project, including a wine purchase. *See* Ex. 39 at 62-66.

The large payment to the hotel that cleared on April 8, 2022, caused the TE checking account to be overdrawn. Ex. 30 at 67. The $40,000 payment that TE received from 12 Gauge on April 12, 2022, helped for a day, but the account was again overdrawn on April 14, 2022. *Id.* All the while, Knight Capital was continuing its daily withdrawal of funds from the TE checking account. Those withdrawals, combined with a payment on the Thompsons' personal Capital One credit card, a payment on the Thompsons' personal mortgage, and a purchase of nearly $1,800 at Trading Post, LLC contributed to the overdraft.

With the TE checking account having been overdrawn for a week, Nicole sent an angry email to Hudack and Worthington on April 21, 2022, demanding immediate payment "otherwise I am unable to pay labor and continue moving this

job forward." Ex. 85. She also said that TE was expecting the payment from 12 Gauge "to cover these auto pulls from our account." *Id.* Yet the automatic deductions from the TE checking account were largely unrelated to the Bantr Project. The automatic payments included the daily withdrawals by Knight Capital and the American Express payment, which included many charges unrelated to the Project. Nicole's suggestion to 12 Gauge that the "auto pulls" were for Bantr Project expenses when they clearly were not is evidence of the Thompsons' intent to use Bantr Project funds for other purposes.

The $30,000 that TE received from 12 Gauge on April 21 covered the existing overdraft with little to spare. Yet Aron and Nicole did not use the remaining money to pay for labor and other Bantr Project expenses. Instead, they authorized a payment of $1,500 to the IRS on April 22, a payment of $2,309.63 on their personal mortgage on April 25, and a payment of $1,278.68 to UW Credit Union for a personal loan on April 26. Ex. 30 at 65-66. Aron and Nicole knew that TE was not using the Bantr Project funds for Project expenses, and the fact that they so immediately used the money for personal expenses after receiving a payment from 12 Gauge supports an inference that they intended not to use the money as required.

The Thompsons both had knowledge of the requirements of the theft by contractor statute, they knew the funds from 12 Gauge were not used for the Bantr Project, and they acted with intent, or at least a conscious disregard of the risk, that the funds would not be used for the Bantr Project. 12 Gauge has sustained its

burden to prove that the Thompsons are liable for theft by contractor under Wis. Stat. §§ 779.02(5), 895.446, and 943.20 and that the debt is nondischargeable under 11 U.S.C. § 523(a)(4).

**6. Damages**

12 Gauge requests entry of judgment based on the Thompsons' breach of the theft by contractor statute. Dkt. No. 96 at 46. With the parties' consent, a bankruptcy court may enter a money judgment on the underlying claim in a nondischargeability action. *See* Fed. R. Bankr. P. 7008, 7012(b); *see also Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 686 (2015) ("Article III permits bankruptcy courts to decide *Stern* claims submitted to them by consent.").

12 Gauge argues that TE misappropriated $187,925.23 of the funds TE received for the Bantr Project. As discussed above, the Court finds that TE spent $176,487.63 on expenses unrelated to the Bantr Project. 12 Gauge submitted evidence that it spent $597,211.65 to perform work that was within the scope of the Contract with TE. 12 Gauge asks the Court to award this entire amount as its damages for theft by contractor.

"While theft by contractor under Wis. Stat. § 779.02(5) occurs at the time the funds are misappropriated, . . . a litigant seeking civil damages under Wis. Stat. § 895.446 must prove causation before recovery is allowed." *KBS Const., Inc. v. McCullough Plumbing, Inc.*, 2010 WI App 19, ¶ 23, 323 Wis. 2d 276, 779 N.W.2d 723 (unpublished). That is, the Court may award only the damages caused by the theft by contractor, as opposed to the contractor's breach of contract.

The amount of 12 Gauge's damages caused by TE's theft by contractor was $176,487.63. 12 Gauge paid TE that amount expecting it would be used for labor, materials, and other Project-related expenses. If TE had so used the funds, TE likely would have been able to perform more of the work covered in the Contract, which would have reduced the amount 12 Gauge had to spend to cover TE's non-performance.

The remainder of 12 Gauge's consequential damages are not directly attributable to TE's theft by contractor. TE did not perform its obligations under the Contract, but that non-performance alone is not a breach of fiduciary duty and does not lead to liability under the theft by contractor statute. It is quite possible that TE would not have been able to complete the Contract work even if it had used the entire sum received from 12 Gauge on Bantr Project expenses. The evidence suggests that the Thompsons mismanaged the Project, the crew, and the mounting expenses. Such mismanagement may be a breach of the Contract, but it is not a breach of fiduciary duty. The Court concludes that 12 Gauge's actual damages for TE's violation of Wis. Stat. § 779.02(5), for which the Thompsons are liable under that statute and Wis. Stat. § 895.446 is $176,487.63.

12 Gauge also requests an award of attorney's fees and costs and exemplary damages under Wis. Stat. § 895.446(3)(b) and (c). Such awards are within the discretion of the trier of fact. *See CoVantage Credit Union v. Stangel (In re Stangel)*, 593 B.R. 607, 615 (Bankr. E.D. Wis. 2018); *Estate of Miller v. Storey*, 2017 WI 99, ¶ 69, 378 Wis. 2d 358, 903 N.W.2d 759) ("[A]lthough the judge initially

determines whether exemplary damages are an appropriate issue to be presented to the trier of fact, it is within the discretion of the trier of fact to determine whether to actually award exemplary damages and, if so, in what amount.”).[11]

In determining whether to exercise discretion to award such fees, a court must make a “reasonable inquiry and examination of the facts.” *Stathus v. Horst*, 2003 WI App 28, ¶ 5, 260 Wis. 2d 166, 170, 659 N.W.2d 165, 167. In addition, whether to award exemplary damages “involves an evaluation of the defendant’s conduct and matters in mitigation of damages.” *Shopko Stores, Inc. v. Kujak*, 147 Wis. 2d 589, 600, 433 N.W.2d 618, 623 (Ct. App. 1988). Facts related to the defendant’s conduct include the seriousness of the hazard to the public, the profitability and duration of the improper conduct, and the potential damage which might have been done by such acts as well as the actual damage.” *Id.* at 602 (internal citation omitted). Facts related to mitigation include “the age of the offender; the attitude and conduct of the offender upon detection; fines and forfeitures already imposed; that the offender is subject to criminal prosecution; the severity of any criminal penalty already imposed; or that the defendant is a person

[11] These cases discuss the trier of fact’s discretion to award exemplary damages under Wis. Stat. § 895.446(3)(c). Their reasoning is equally applicable to an award of costs and attorney’s fees under Wis. Stat. § 895.446(3)(b). The availability of both types of damages is preceded by the word “may”—i.e., a prevailing plaintiff “may recover all of the following . . . .” Wis. Stat. § 895.446(3). In addition, the Wisconsin Court of Appeals applied the reasoning of these cases in addressing the discretionary nature of both types of awards in *Thunderbird Eng’g, Inc. v. Am. Design, Inc.*, 2023 WI App 44, 995 N.W.2d 489 (unpublished per curiam). The *Thunderbird Engineering* case cannot be cited in Wisconsin courts, *see* Wis. Stat. § 809.23(3)(b); the Court cites it here to demonstrate that other courts have similarly concluded that awards of costs and attorney’s fees under Wis. Stat. § 895.446(3)(b) are discretionary.

of modest means who will be severely punished by a relatively small amount of punitive damages." *Id.*

The facts here do not warrant an award of attorney's fees or exemplary damages. The Thompsons' conduct in carelessly spending Bantr Project funds on large expenses entirely unrelated to the Project was egregious in light of their recent experience with criminal charges against Aron. But their conduct involved little risk to the public. TE's work itself was sound, at least when Aron was on site overseeing the crew; there was no evidence that the work was inferior or deficient for a residential project. To the contrary, 12 Gauge consistently complimented the work when Aron actually devoted his time and attention to the Project and managing the crew.

TE's work was overseen by 12 Gauge, a highly experienced and sophisticated general contractor that was readily able to cover the work and expenses caused by the theft by contractor. More importantly, 12 Gauge was in a position to prevent many of its damages. By February 25, 2022, just four days after giving TE the first payment of $110,000 on February 21, Worthington was aware that Aron was not consistently present on the job site. Ex. 67. In response to Worthington's inquiry about Aron's attendance, Nicole responded demanding more money. *Id.* At that point, 12 Gauge had plenty of reason to suspect that TE was not using all the money it received from 12 Gauge to pay for labor and materials for the Bantr Project. Yet 12 Gauge waited more than two months to investigate, not even asking for a budget and list of expenses until mid-April.

In addition, the Thompsons' misuse of Project funds was short in duration, lasting only about three months. The Thompsons were young and inexperienced during the Bantr Project. Aron started TE in 2019, less than three years before he started work on the Project. It is clear from the evidence that Aron was out of his depth with the Bantr Project. Likely with the MBS Project, as well, because much of the misappropriated money went to pay for expenses related to the MBS Project. By the time of the trial, Aron's demeanor reflected some remorse over TE's inability to finish the Contract work, and Aron credibly testified that he likely would never own a construction business again, realizing that managing the books of such a business is not one of his strengths. Having already filed bankruptcy and now indebted nearly $200,000, the Thompsons have little ability to pay further damages; the large award of actual damages likely will be punishment enough. Moreover, Aron did devote much labor to the Bantr Project, even if the Court is unable to quantify it or the amount he would be owed for that labor.

## CONCLUSION

For the foregoing reasons, the Court concludes that 12 Gauge did not sufficiently prove that the underlying debt, if any, is not dischargeable under 11 U.S.C. § 523(a)(2)(A). The Court concludes that the Thompsons are liable to 12 Gauge for theft by contractor under Wis. Stat. § 779.02(5), that 12 Gauge may recover damages in the amount of $176,487.63, and that the debt is not dischargeable under 11 U.S.C. § 523(a)(4). The Court will enter a separate order consistent with this Decision.

# # #